RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0364P (6th Cir.)
File Name: 02a0364p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

EARNEST BELL, JR.,
       *Plaintiff-Appellant,*

    *v.*

ROBERT JOHNSON, et al.,
       *Defendants,*

MARK STIMPSON; ALLEN
BLATTER,
       *Defendants-Appellees.*

No. 01-1286

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 94-72086—John Corbett O'Meara, District Judge.

Argued: August 8, 2002

Decided and Filed: October 17, 2002

Before: KEITH, MOORE, and GILMAN, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Paul D. Reingold, UNIVERSITY OF
MICHIGAN CLINICAL LAW PROGRAM, Ann Arbor,

Michigan, for Appellant.  John L. Thurber, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellees. **ON BRIEF:**    Paul D. Reingold, UNIVERSITY OF MICHIGAN CLINICAL LAW PROGRAM, Ann Arbor, Michigan, for Appellant.  John L. Thurber, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

—————————

## OPINION

—————————

KAREN NELSON MOORE, Circuit Judge.  The Appellant Earnest Bell, Jr., a former inmate at the State Prison for Southern Michigan in Jackson ("Jackson"), appeals the district court's grant of judgment as a matter of law to Defendants-Appellees, Alan Blatter and Mark Stimpson, following the presentation of plaintiff's case-in-chief in a jury trial.  Bell's § 1983 claim alleged that Blatter and Stimpson, who are both prison guards at Jackson, shook down his cell and confiscated his legal papers and medical diet snacks in retaliation for a civil rights lawsuit filed by Bell while he was an inmate at Jackson.  The district court determined that Bell's evidence was insufficient as a matter of law to show that a person of ordinary firmness would be deterred by the alleged retaliatory acts.  Alternatively, the district court found that the standard for First Amendment claims was not clearly established at the time of the events in question.  The district court concluded that the established standard at the time of the alleged retaliatory acts required an inmate to show that the defendants' conduct "shocked the conscience."  Finding that Bell could not meet this burden, the court determined that the defendants were entitled to qualified immunity.  For the reasons that follow, we **REVERSE** the district court's decision and **REMAND** for further proceedings consistent with this opinion.

### III.  CONCLUSION

Based upon the foregoing discussion, we **REVERSE** the district court's grant of judgment as a matter of law to the defendants and **REMAND** for further proceedings consistent with this opinion.

### I.  FACTS AND PROCEDURE

**A.  Factual Background**

Bell is a former prisoner at the State Prison for Southern Michigan in Jackson. In 1993-94, Bell was serving a sentence for armed robbery.  He was assigned to administrative segregation during his stay at Jackson because he was diagnosed with AIDS and had engaged in consensual sex with another inmate.  Bell was paroled in 1994.  Bell returned to Jackson later that year after he violated his parole by failing a drug test.  When he returned to prison, Bell was once again assigned to administrative segregation based upon his prior sexual misconduct.

In administrative segregation, prisoners are housed alone in cells with steel doors.  Prisoners in segregation are locked in their cells for twenty-three hours each day, but are allowed to spend one hour in the prison yard, where the inmates are placed in cages to isolate them.  Because prisoners in segregation are not allowed to congregate, the prisoners communicate with each other by yelling through cracks under the cell doors, passing notes through guards, or sliding notes between cells using paper and string.

In April 1994, Bell sought legal assistance in pursuing a variety of civil rights claims from a jailhouse lawyer named Thaddeus-X who was housed in a nearby cell. On April 20, 1994, Bell and Thaddeus-X signed a legal assistance agreement, which was approved by a deputy warden. With Thaddeus-X's assistance, Bell filed a lawsuit against seventeen prison guards and administrators, including Sgt. Alan Blatter and Officer Mark Stimpson. Bell's suit alleged a number of claims, including a challenge to his placement in administrative segregation.  Before the lawsuit was filed, prison guards assisted Bell by providing him with writing materials and by passing papers and legal materials between Bell and Thaddeus-X.

Bell claims that the guards began treating him differently after the lawsuit was filed.  The guards began refusing to

provide Bell with writing supplies or to pass legal materials between Bell and Thaddeus-X. According to Bell, and fellow inmate Eric Waddell, Bell's lawsuit was common knowledge among the guards because Thaddeus-X frequently boasted about the suit, and because the prisoners on the floor had discussed the suit by shouting from cell to cell. In response to what he perceived to be undue harassment by several of the prison guards, Bell sent a "Notice of Litigation" to the seventeen named defendants in his lawsuit on June 3, 1994. The notice explained that Bell had filed a federal lawsuit against the named defendants and warned that "[a]ny further harassment or retaliation will be reported immediately to [the district judge] by plaintiff." Joint Appendix ("J.A.") at 332.

On June 6, 1994, Sgt. Blatter conducted a search of Bell's cell while Bell was in the prison yard for his daily hour of "yard time." When Bell returned to his cell, he found the cell in disarray, and he noticed that some of his legal papers and his medical diet snacks had been taken. Waddell, whose cell was directly across the hall from Bell's, saw Blatter enter the cell and leave with papers and Bell's snacks. Bell testified that he was allowed to keep the medical snacks in his cell because he had AIDS and he needed extra food to slow his weight loss. At trial, Blatter admitted to conducting the cell search and to removing Bell's medical snacks, although he denied taking any legal papers. Blatter also acknowledged that the food was given to Bell for medical reasons.

Bell filed two grievances concerning the June 6 search of his cell. On June 7, 1994, Bell spoke with Sgt. Blatter and asked him about the legal materials. According to Bell, Blatter responded by telling Bell that "if [he] knew what was good for him, that [he] better write the courts [and] have the litigation dismissed." J.A. at 371 (Pl. Exh. 20). On June 8, the prison staff moved Thaddeus-X from the second floor to the base level of administrative segregation, making it very

inmate allegations substantially similar to Bell's stated cognizable claims for First Amendment retaliation under the same basic First Amendment principles that underlie *Gibbs* and *Newsom*. *See Wright*, 795 F.2d at 968; *Green*, 977 F.2d at 1389-91; *Hall*, 755 F.2d at 787-88; *accord Penrod*, 94 F.3d at 1404 (denying qualified immunity because clearly established law in 1992 prohibited confiscating legal materials, denying prisoners hygiene items, and transferring prisoners to segregation in retaliation for accessing courts); *cf. Scher v. Engelke*, 943 F.2d 921, 925 (8th Cir. 1991) ("This is a clear case of a prisoner who was subjected to retaliatory cell searches and conduct violations for bringing the illicit conduct of a prison guard to the attention of prison officials. The law making retaliation for the exercise of a constitutional right actionable under § 1983 has been established for some time and an objectively reasonable official could not fail to know of it."), *cert. denied*, 503 U.S. 952 (1992). This authority further informs our understanding of what law was clearly established in 1994. *See Chappel*, 131 F.3d at 579. In combination with our own decisions in *Gibbs* and *Newsom*, we think this authority would have alerted a reasonable prison official in 1994 that confiscating legal papers and other property in retaliation for the prisoner's exercise of his right of access to the courts would violate the inmate's constitutional rights.

In sum, we conclude that the plaintiffs' allegations, if proven, would establish a violation of the law that was clearly established in 1994. Our review of the relevant case law reveals that it was not until *McLaurin* was issued in 1997 that a reasonable official might expect to escape liability for retaliatory acts falling short of conscience-shocking abuses of power. Prior to that opinion, the published authority in our circuit made it clear that the "shocks the conscience" test did not apply to retaliation claims expressly brought under the First Amendment. We therefore determine that defendants are not entitled to qualified immunity.

cited by the defendants was vacated in a per curiam order, *McLaurin*, 202 F.3d 269 (6th Cir. 1999) (unpublished table decision), and therefore any statements contained in that opinion lack precedential value.

We conclude that *Gibbs* and *Newsom* set forth the legal standards for a First Amendment retaliation claim of which a reasonable official would have been aware in 1994. Under this standard, it was clear that adverse actions falling short of "conscience-shocking" abuses of power would give rise to a cognizable constitutional claim if they were undertaken in retaliation for a prisoner's exercise of his or her First Amendment rights. We conclude that a reasonable official would have been aware that, under the *Gibbs* and *Newsom* standard, conducting harassing cell searches and confiscating an inmate's legal papers and medical dietary supplements in retaliation for the inmate's exercise of his right of access to the courts would give rise to constitutional liability. These actions are comparable in seriousness, we think, to the warden's refusal to reappoint a prisoner as an inmate legal advisor that was at issue in *Newsom*, 888 F.3d 371. That opinion, in particular, made it quite clear that an injury inflicted in retaliation for an inmate's protected conduct need not be severe to be actionable. *Id.* at 378.

Moreover, we note that, at the time of the defendants' actions, at a number of cases from other circuits had held that

applied inconsistent analyses for [prisoner] retaliation claims, often requiring a prisoner to demonstrate that the defendant's conduct 'shocks the conscience.'" *Id.* at *2. We decline defendants' invitation to adopt the reasoning of *Wozniak*. *Wozniak* was unpublished and therefore is not binding on this panel. *Salamalekis*, 221 F.3d at 833. Moreover, we think that *Wozniak* misconstrued *Thaddeus-X*. Although it is true that the *Thaddeus-X* en banc opinion noted the existence of inconsistent authority in this circuit, the *Thaddeus-X* court explicitly observed that the "shocks the conscience" standard had been imposed "mainly in unpublished opinions." 175 F.3d at 387. Based upon our review of the published authority available in 1994, we conclude that the law of First Amendment retaliation was clear at that time that the "shocks the conscience" standard did not apply to First Amendment retaliation cases.

difficult for Bell to communicate with him about the lawsuit.[1] That day, Bell filed an amended complaint describing the retaliatory cell search on June 6.

On June 15, 1994, notice of Bell's lawsuit was officially received by the prison litigation coordinator on behalf of defendants Blatter and Stimpson. On June 20, 1994, Officer Stimpson allegedly came to Bell's cell and told Bell that he "was going to pay" for filing the lawsuit. J.A. at 373 (Supp. Compl.). While Bell was in the prison yard on June 20, Sgt. Blatter and Officer Stimpson again searched Bell's cell. Bell returned to find that more of his legal materials were missing. Waddell observed this search from his cell and saw Blatter and Stimpson confiscate Bell's food and legal papers. Bell filed another grievance four days later seeking the return of his property.

Michigan Department of Corrections ("MDOC") policy regulates shakedowns of prisoners' cells. MDOC Policy Directive 04.04.110 provides that "no search shall be conducted for the purpose of harassing or humiliating a prisoner." J.A. at 347 (Exh. 12). The policy further instructs prison staff to "use reasonable care in conducting the search to protect and safeguard the prisoner's property and . . . attempt to leave searched areas in a similar condition to what they were prior to the search." J.A. at 347. Prison staff are also directed to enter the cell search into the cell-search log and to complete a contraband-removal record and a notice of intent to conduct an administrative hearing whenever non-dangerous contraband is removed from a prisoner's cell. No entry was made in the cell-search log, nor was any notice of intent filed, in connection with either the June 6 or the June 20 search of Bell's cell.

[1]Base level of segregation is traditionally reserved for potential suicides and mentally ill inmates, and is known for its "unpleasant and unhealthy conditions." *Thaddeus-X v. Blatter*, 175 F.3d 378, 384 (6th Cir. 1999) (en banc).

Bell stated that his legal materials were never returned to him. He eventually was able to obtain copies from his sister, who had kept duplicates of some of his filings. Bell testified that he became angry and afraid as a result of the actions of prison officials regarding his lawsuit. He explained: "I was angry. It got to the point where I was kind of skeptical from going to the yard. I had started being afraid because my medical snacks, they could have started to, doing anything to my food . . . ." J.A. at 217 (Bell Tr. at 126).

## B. Procedural History

Plaintiff filed his initial pro se complaint on May 27, 1994. Bell's original complaint named seventeen defendants, including Stimpson and Blatter, and alleged a number of claims including racial discrimination, retaliatory harassment, privacy violations, violations of due process, and allegations that certain conditions of his confinement were cruel and unusual. On July 5, 1994, Bell filed a supplemental complaint adding a claim of First Amendment retaliation based upon the cell searches by Stimpson and Blatter. On August 15, 1995, a federal magistrate judge issued a report recommending dismissal of all of plaintiff's claims except for his retaliation claims relating to the searches of his cell on June 6 and June 20, 1994. In analyzing the First Amendment retaliation claim, the magistrate judge rejected defendants' argument that Bell was required to show that the alleged retaliatory actions "shocked the conscience." The magistrate judge noted that the Sixth Circuit had previously ruled that claims based upon explicit constitutional guarantees should be analyzed according to the relevant standards applicable to the particular right at issue, rather than the "shocks the conscience" standard applicable to substantive due process claims. J.A. at 60 (citing *Braley v. City of Pontiac*, 906 F.2d 220, 226 (6th Cir. 1990)). The magistrate judge then concluded that the plaintiff's allegation stated a valid First Amendment retaliation claim in light of cases from this court and other circuits permitting First Amendment claims to go forward on similar facts. The district court entered an order on October 4, 1995, adopting the magistrate judge's report

at 410. Second, we think that *McLaurin* incorrectly described the state of the law when it observed that the Sixth Circuit had consistently required inmates to show "conscience-shocking" behavior to state retaliation claims. In fact, all of our published authority following *Cale* and preceding *McLaurin* was to the contrary.[6] Other than the *Cale* opinion, the only authorities cited by *McLaurin* on the "shocks the conscience" requirement were unpublished cases. It is well-established law in this circuit that unpublished cases are not binding precedent. *Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 833 (6th Cir. 2000); *Cattin v. Gen. Motors Corp.*, 955 F.2d 416, 431 n.14 (6th Cir. 1992). The concurrence in *McLaurin* made this very point. *McLaurin*, 115 F.3d at 413 (Ryan, concurring) ("[T]he majority's reliance on unpublished case law may be interesting as an academic matter, but those cases simply do not have the weight of authority."). Thus, the unpublished cases cited in *McLaurin* could not have provided any assurance to a reasonable official that the "shocks the conscience" standard would have been applied in 1994, particularly in light of clear published authority to the contrary.[7] Moreover, we note that the *McLaurin* opinion

---

[6]Tellingly, the original panel decision in *Thaddeus-X*, issued approximately two months before *McLaurin*, discerned no ambiguity in the law of First Amendment retaliation. 1997 WL 169387, at *3 (6th Cir. April 11, 1997). Rather, in setting forth the governing retaliation principle, the panel cited *Zilich v. Longo*, 34 F.3d 359, 364 (6th Cir. 1994), *cert. denied*, 514 U.S. 1036 (1995), and *Gibbs*, 10 F.3d at 378, and stated simply that "[r]etaliation against an inmate for exercising his constitutional rights is itself a violation of the Constitution." *Thaddeus-X*, 1997 WL 169387, at *3. There was no suggestion in the original *Thaddeus-X* opinion that the plaintiff had to meet the heightened "shocks the conscience" test. Rather, the court stated that "[t]o the extent [the defendants'] retaliatory actions go beyond de minimis, . . . they support a retaliation claim." *Id.* at *9.

[7]Defendants also rely on an unpublished per curiam order issued by this court in *Thaddeus-X v. Wozniak*, 2000 WL 712383 (6th Cir.). In *Wozniak*, which was appealed by the plaintiff Thaddeus-X pro se, a panel of this court affirmed the district court's grant of qualified immunity in a prisoner First Amendment retaliation claim. In that order, we observed that "the [*Thaddeus-X* en banc] court noted that this circuit previously had

light of the more recent Supreme Court decision in *Graham v. Connor*, . . . I am confident that the Sixth Circuit in another case involving a prison guard's intentional infringement of an inmate's First Amendment rights by some retaliatory acts or threats would, like *Newsom*, allow the finding of a constitutional tort without the need for . . . a separate finding, in a bench trial, that this behavior also either 'shocks the conscience' or is an 'egregious abuse of governmental power.'"). Our conclusion is supported by the fact that in his 1995 report and recommendation, the magistrate judge in the instant case expressed the belief that it was clear, under *Graham*, 490 U.S. 386, and *Braley*, 906 F.2d at 225-26, that the "shocks the conscience" test did not apply to Bell's First Amendment retaliation claims. J.A. at 60 ("Two years after *Cale* . . . the Sixth Circuit recognized that substantive due process claims based on explicit constitutional guarantees . . . offer a more concrete, and therefore superior, guide to judges than intuitive standards such as behavior that shocks the conscience." (quotations omitted)).

Defendants rely on this court's 1997 opinion in *McLaurin*, 115 F.3d 408, as evidence that the "shocks the conscience" test applied to prisoner retaliation claims at the time of the defendants' actions. In *McLaurin*, a panel of this court observed that "this court has repeatedly demanded that retaliation claims arising from the exercise of First Amendment rights be shocking to the conscience." *Id.* at 410. Thus the *McLaurin* court concluded that the plaintiff inmate in that case could not state a valid retaliation claim where the only retaliatory act alleged was the filing of a false major misconduct ticket. *Id.* at 411. Defendants contend that the *McLaurin* court's observation that the "shocks the conscience" test had been routinely applied in this circuit prior to 1997 demonstrates that this standard was the clearly established law in 1994.

Defendants' reliance on *McLaurin* is misplaced. First, *McLaurin* was decided several years after the events at issue in the instant suit, and therefore could not form the basis for a reasonable officer's understanding of the law in 1994. *Id.*

and recommendation. Plaintiff subsequently secured counsel, and filed a second amended complaint on May 9, 1997. Bell's second amended complaint asserted only the First Amendment retaliation claims arising from the two searches of Bell's cell on June 6 and June 20, 1994.

Defendants filed a motion for summary judgment in 1997 after this court handed down its decision in *McLaurin v. Cole*, 115 F.3d 408 (6th Cir. 1997), *vacated*, 202 F.3d 269 (6th Cir. 1999) (unpublished table decision). Defendants claimed that *McLaurin* clarified the legal standard for First Amendment retaliation claims, insofar as it held that an inmate alleging First Amendment retaliation must be able to show that the alleged retaliatory actions were so egregious or oppressive that they "shocked the conscience." The magistrate judge addressed this claim in his November 12, 1997 report and recommendation. Noting that *McLaurin* was "[t]he only recent published opinion by the Sixth Circuit addressing the issue of a prisoner's claim of retaliation," the magistrate judge concluded that the "shocks the conscience" test was the appropriate legal standard for Bell's claim. J.A. at 100. Nevertheless, the magistrate judge concluded that the facts presented by Bell were sufficient to state a claim under the *McLaurin* standard. The magistrate judge explained:

I am satisfied that, should it be determined that Defendants in fact engaged in the disputed conduct, their actions reach the level of shocking the conscience, and of an egregious abuse of governmental power. The unwarranted seizure of a prisoner's authorized property, whatever the monetary value of that property may be, is an ignoble and cowardly abuse of authority, at best. It contributes to the malignant distrust and antagonism which, all too often, leads to physical conflict and injury. . . . A theft motivated by an intent to intimidate a prisoner through ad hoc, unofficial discipline is particularly odious, to the point of shocking the conscience.

J.A. at 101. Consequently, the magistrate judge recommended that defendants' motion for summary judgment on the merits and on qualified immunity be denied. The district court adopted the magistrate's report and recommendation in an order entered on December 10, 1997.

The district court placed Bell's case on the inactive docket for several months while it awaited this court's en banc decision in *Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999). The suit in *Thaddeus-X* was filed separately from the instant case. That suit was filed by the plaintiff Bell along with his jailhouse lawyer, Thaddeus-X. Although the two cases were docketed with different district judges, they involved substantially the same sequence of events. The instant appeal concerns the original suit filed by Bell, to which Bell's First Amendment retaliation claims relating to the two cell searches of June 6 and 20, 1994, were subsequently added. The suit in *Thaddeus-X* alleged retaliation claims on behalf of both Bell and Thaddeus-X arising from other actions taken by prison officials in response to Bell's suit, in addition to an Eighth Amendment claim raised by Thaddeus-X challenging the conditions of incarceration on the base level of administrative segregation. Bell's claim in *Thaddeus-X* stemmed from his allegations that another cell-block officer named Karazim deliberately harassed him and threatened to serve him only cold meals unless he dropped his lawsuit. *Thaddeus-X*, 175 F.3d at 399.

In *Thaddeus-X*, we definitively stated that the "shocks the conscience" test was not the appropriate standard for a prisoner First Amendment retaliation claim. *Id.* at 383, 387-88. Instead, we explained that an adverse action undertaken in retaliation for a prisoner's exercise of his or her First Amendment rights could violate the First Amendment "if it is capable of deterring a person of ordinary firmness from exercising his or her right to access the courts." *Id.* at 398.

After we issued our opinion in *Thaddeus-X*, the instant suit was returned to active status and the district court scheduled

the same standards applied to such claims in the other contexts, rather than the "shock the conscience" standard applicable to substantive due process claims.

In addition, we think that any reasonable doubt as to whether the "shocks the conscience" test applied to First Amendment retaliation claims was almost certainly dispelled by the Supreme Court's opinion in *Graham v. Connor*, 490 U.S. 386 (1989), issued one year after *Cale*, and our own cases following *Graham*. In *Graham*, the Supreme Court rejected the use of the Fourteenth Amendment "shocks the conscience" standard in cases involving excessive force claims otherwise cognizable under the Fourth Amendment. *Id.* at 394. The *Graham* Court clearly instructed that "[t]he validity of [a § 1983] claim must . . . be judged by reference to the specific constitutional standard which governs that right," rather than the more general "shocks the conscience" test applicable to substantive due process claims. *Id.* After the Supreme Court's decision in *Graham*, we held in a number of cases that the "shocks the conscience" test applied *only* to claims that could not be traced to an explicit constitutional guarantee. As one panel explained in 1990:

> If appellant's § 1983 claim is construed to be based on an alleged violation of substantive due process, then the claim must be based either on a violation of an explicit constitutional guarantee (e.g., a fourth amendment illegal seizure violation) or on behavior by a state actor that shocks the conscience. Appellant's complaint alleges no violation of a specific constitutional guarantee. Therefore the claim must be based on behavior that shocks the conscience.

*Braley*, 906 F.2d at 225-26; *see also Mertik v. Blalock*, 983 F.2d 1353, 1367 (6th Cir. 1993); *Mansfield Apartment Owners Ass'n v. City of Mansfield*, 988 F.2d 1469, 1476 (6th Cir. 1993). These cases, we think, had clearly established by 1994 that the "shocks the conscience" test would not apply to § 1983 claims based expressly on the First Amendment. *See Riley v. Kurtz*, 893 F. Supp. 709, 718 (E.D. Mich 1995) ("In

"even minimal infringement upon First Amendment values constitutes irreparable injury." *Id.* at 378. Although we made passing reference to *Cale* in the *Newsom* case, *id.* at 376-77, we did not apply the Fourteenth Amendment "shocks the conscience" standard. To the contrary, we emphasized that "direct retaliation by the state for having exercised First Amendment freedoms in the past is *particularly proscribed* by the First Amendment." *Id.* at 379 (emphasis added).

In *Gibbs*, an inmate "jailhouse lawyer" alleged that prison officials intentionally delayed his release from administrative segregation in retaliation for his assisting other prisoners with legal matters. We held that these allegations stated an actionable First Amendment retaliation claim. *Gibbs*, 10 F.3d at 379. In our discussion of the plaintiff's claim, we cited *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977), a public employment retaliation case, for the proposition that "government officials may not retaliate against persons who have participated in constitutionally protected conduct." *Gibbs*, 10 F.3d at 378. We also observed that a First Amendment retaliation claim is equivalent to a claim of direct interference with First Amendment rights:

> Here, segregation of a "jailhouse lawyer" in retaliation for providing legal aid is equivalent to the prison regulation barring [inmate legal] assistance in [*Johnson v.*] *Avery*[, 393 U.S. 483, 490 (1969)]. Each instance is an example of state action by prison officials which potentially may result in a denial of access to the courts. If proven to be true, said actions are constitutionally impermissible.

*Gibbs*, 10 F.3d at 378. The *Gibbs* case made it clear that a retaliation claim may lie, even when the allegedly retaliatory conduct itself would not be actionable if taken for nonretaliatory reasons. *Id.* at 379. Thus, after *Gibbs* — which was issued just one year before the events at issue in the instant case — we think it was clear that an inmate's First Amendment retaliation claim would be assessed according to

a jury trial.[2] The trial began on January 17, 2001. At the close of the plaintiff's case, the defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). The defendants argued that Bell's proof was insufficient to satisfy the standard for retaliation announced in *Thaddeus-X*. In the alternative, the defendants argued that the "shocks the conscience" standard should be applied to defendants' conduct, since that was the standard in effect at the time of their actions.

The district court granted defendants' motion. The court first noted its belief that "[t]he proposition that a plaintiff would be able to use [section] 1983 to protect one of our most sacred constitutional rights based not upon his own effective deprival [sic] of those rights but upon a deprival [sic] which might have injured some hypothetical person of ordinary firmness — whatever that means — is not a judicially or juridically satisfying proposition." J.A. at 319. Turning to the merits, the court concluded that the "shocks the conscience" standard, rather than the *Thaddeus-X* standard, was "the only law of which guards who are defendants here could have been aware on June 1994." J.A. at 320. The court concluded that, as a matter of law, the plaintiff had not shown that defendants' actions shocked the conscience. In the alternative, the court ruled that Bell had presented insufficient evidence to show that the defendants' actions would deter a person of ordinary firmness from exercising his or her First Amendment rights. In reaching this conclusion, the court explained:

---

[2]After this court en banc decided *Thaddeus-X*, Bell renewed his earlier motion to consolidate the instant case with *Thaddeus-X*. Bell noted that Thaddeus-X had voluntarily dismissed his separate Eighth Amendment claim, with the result that the only claims remaining in either case were the First Amendment retaliation claims arising from the same sequence of events following Bell's initiation of the instant lawsuit. The district court entered a one-sentence order on November 7, 2000, denying plaintiff's motion for consolidation.

I'm not sure how this evidence could be presented frankly, perhaps by an expert, if there are any experts. I'm not sure either that we're dealing with a very good legal standard if it requires jurors to divine what level of character firmness would be required to allow a prisoner in administrative segregation to persist. How do jurors do that? They're there, we hope they're there based on their own experience. Well, that is an experience that only a rare . . . juror . . . would ever have.

J.A. at 320-21. Following the district court's dismissal of his claims, plaintiff filed a timely notice of appeal.

## II. ANALYSIS

### A. Standard of Review

Under Federal Rule of Civil Procedure 50(a)(1), the moving party is entitled to judgment as a matter of law if the nonmoving party "has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." In considering a Rule 50 motion, "the court should review all of the evidence in the record." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.* "That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* at 151 (quotation omitted).

### B. Qualified Immunity

Both parties characterize the district court's ruling as a determination that the defendants are, as a matter of law, entitled to qualified immunity from suit. According to the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does

that the inmate's claim was based on his general substantive due process rights and not on the First Amendment." *Thaddeus-X*, 175 F.3d at 387-88. *Cale* drew the "shocks the conscience" standard from a malicious prosecution case and a case involving child custody rights, not from First Amendment cases. 861 F.2d at 949. The *Cale* court made reference to the First Amendment only in its condemnation of the defendants' motives. We therefore do not think a reasonable officer would have expected *Cale* to apply to inmate claims raised expressly under the First Amendment.

We conclude that the established law governing prisoner First Amendment retaliation claims in 1994 was instead set forth in two cases from this circuit decided after *Cale*: *Newsom v. Norris*, 888 F.2d 371 (6th Cir. 1989), and *Gibbs v. Hopkins*, 10 F.3d 373 (6th Cir. 1993). In *Newsom*, we affirmed the grant of a preliminary injunction directing a prison warden to reappoint certain prisoners to their former posts as inmate legal advisors. The plaintiffs in *Newsom* alleged that the warden had refused to reappoint them as inmate advisors in retaliation for complaints they had filed with the prison disciplinary board. We concluded that plaintiffs had shown sufficient likelihood of success on their retaliation claim to warrant the injunction. We explained that, even though the plaintiffs had no protected property interest in maintaining their positions as inmate advisors, "[i]t is well recognized that it is constitutionally impermissible to terminate even a unilateral expectation of a property interest in a manner which violates rights of expression protected by the First Amendment." *Newsom*, 888 F.2d at 375. Drawing on public employment cases, we explained that "[e]xisting case precedent indicates that a failure to reappoint an individual to a position is . . . impermissible, even where there was no cognizable expectation of continued service, if reappointment was denied because of the individual's exercise of First Amendment rights." *Id.* at 376. Thus, *Newsom* clearly established that an inmate need not show that the retaliatory action, standing alone, was sufficiently egregious to violate the Constitution. Indeed, in finding that the plaintiffs had shown irreparable injury, we explained that

Instead, the district court determined that the established law in June of 1994 required an inmate asserting a First Amendment retaliation claim to prove that the alleged retaliatory actions were so egregious or oppressive that they "shocked the conscience." Thus, the district court concluded that a reasonable officer would not have been aware that retaliatory acts falling short of "conscience-shocking" abuses of power would give rise to constitutional liability. Based upon our review of the relevant case law, we conclude that the district court mischaracterized the law that was clearly established in 1994. The clear weight of published authority in this circuit in 1994 directed courts not to apply the "shocks the conscience" standard to inmate retaliation claims expressly raised under the First Amendment. Under the standard that was applied to such claims in 1994, a reasonable official would have been aware that actions such as harassing cell searches and confiscation of legal papers and other property could give rise to a First Amendment retaliation claim.

The defendants argue that *Cale v. Johnson*, 861 F.2d 943, 949-50 (6th Cir. 1988), established that the "shocks the conscience" test applied to inmate retaliation cases in 1994. We disagree. In *Cale*, an inmate alleged that prison guards violated his substantive due process rights by falsely accusing him of possessing marijuana and placing him in administrative segregation in retaliation for his complaints about prison conditions. The *Cale* court found these allegations sufficient to state a substantive due process claim. *Id.* at 948. The court began its discussion by explaining that the standard for "malicious prosecution-type substantive due process claims" was "whether defendants' conduct 'shocks the conscience.'" *Id.* at 949 (quotations omitted). Applying this standard, the court concluded that maliciously framing an inmate for an offense, and subjecting him to a risk of prolonged incarceration resulting from the loss of good-time credits, for no other reason than to punish him for exercising his First Amendment rights was an egregious abuse of governmental power. *Id.* at 950. Although it made reference to the First Amendment, "[the *Cale* court] clearly explained

not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity involves a two-step inquiry. First, the court must determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 2156 (2001). "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.*; *see also Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996). Ultimately, qualified immunity is a question of law that is reviewed de novo. *See Dickerson*, 101 F.3d at 1157.

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). "Although it need not be the case that 'the very action in question has previously been held unlawful, . . . in the light of pre-existing law, the unlawfulness must be apparent.'" *Id.* (quoting *Anderson*, 483 U.S. at 640). As the Supreme Court has recently explained, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 122 S. Ct. 2508, 2516 (2002). "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Id.* In determining whether a constitutional right is clearly established, we "look[] first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Chappel v. Montgomery County Fire Prot. Dist. No. 1*, 131 F.3d 564, 579 (6th Cir. 1997) (quotation omitted).

Although the district court did not explicitly discuss the various aspects of the qualified immunity standard, the court

apparently concluded that defendants were entitled to judgment as a matter of law as to both prongs of the qualified immunity test. First, the court found that Bell had not shown sufficient facts to establish that a constitutional violation had occurred under the controlling legal standard announced in *Thaddeus-X*. In particular, the court found insufficient evidence to show that the alleged retaliatory actions — the two shakedowns of plaintiff's cell and the concomitant confiscation of his legal papers and medical diet snacks — would deter a person of ordinary firmness from engaging in protected conduct. Second, assuming that Bell could carry his burden under the *Thaddeus-X* standard, the court concluded that this standard was not clearly established in 1994 and that a reasonable officer would not have understood that retaliatory actions falling short of "conscience-shocking" abuses of power could give rise to a constitutional violation. Concluding that no reasonable officer would have known that shaking down an inmate's cell and confiscating legal documents and food could be found to be "conscience-shocking," the court determined that the defendants were entitled to judgment as a matter of law under the second prong of the qualified immunity test as well.

### 1. Constitutional Violation

The first step in the qualified immunity analysis is determining whether the plaintiff has presented sufficient facts to show that the defendants' conduct violated his constitutional rights. Bell's only claim in the instant case is that the defendants violated his First Amendment rights by conducting two shakedowns of his cell and confiscating his legal papers and medical diet snacks in retaliation for his exercising his right of access to the courts. The controlling legal test for prisoners' First Amendment retaliation claims was set forth in this court's en banc decision in *Thaddeus-X*:

> A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in

distinct retaliation claims alleged by the plaintiff in the instant case, Bell, and his jailhouse lawyer, Thaddeus-X, which arose from the same nucleus of facts at issue here. The protected conduct asserted in *Thaddeus-X* was the very same lawsuit asserted to be the protected conduct in the instant case. The en banc court in *Thaddeus-X* held that Bell's suit was protected conduct.[4] In reaching this conclusion, the court noted that the fact that the suit did not survive summary judgment did not render the act of filing it any less protected. *Id.* A panel of this court may not overrule the decision of the full circuit sitting en banc. *LRL Props. v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1105 n.2 (6th Cir. 1995). We are therefore bound by the *Thaddeus-X* court's determination that Bell's lawsuit was protected conduct.[5]

### 2. Whether the Relevant Law Was Clearly Established

The district court held that even if plaintiff could satisfy his burden under the *Thaddeus-X* standard, this standard was not clearly established at the time of the events in question.

---

[4] In addition, the parties jointly stipulated before trial in the instant case that "Plaintiff engaged in conduct protected by the Constitution's First Amendment right to petition the government for redress when he filed this original May 26, 1994 lawsuit." J.A. at 376. Defendants cannot now maintain that the plaintiff failed to prove that his suit was protected conduct, when they have already stipulated to this fact.

[5] Even if we were to apply the standard announced in *Herron*, Bell's suit would still qualify as protected conduct. *Herron*'s ruling is limited to retaliation claims involving suits dismissed as frivolous. The Supreme Court's decision in *Lewis*, upon which *Herron* relied, makes it clear that a claim need not be successful to be non-frivolous. *Lewis*, 518 U.S. at 353 nn.2-3. *Lewis* explained, for example, that the fact that a claim is procedurally defaulted does not necessarily make the suit frivolous. *Id.* at 353 n.2. Moreover, *Lewis* distinguished between "arguable" claims and "frivolous" claims, and explained that "[d]epriving someone of an arguable (though not yet established) claim inflicts actual injury because it deprives him of something of value — arguable claims are settled, bought, and sold." *Id.* at 353 n.3. Bell's suit lost at summary judgment; it was not dismissed as being frivolous. Therefore, the *Herron* rule would not apply in the instant case.

### b. Protected Conduct

Defendants maintain that, even if this court determines their actions to be adverse, plaintiff has not shown that he engaged in protected conduct because the underlying suit, which allegedly provoked the defendants' acts of retaliation, has been dismissed. The defendants concede that protected conduct, for the purposes of a First Amendment retaliation claim, encompasses a prisoner's efforts to access the courts in direct appeals, habeas corpus actions, and civil rights claims. We so held in *Thaddeus-X*, 175 F.3d at 391. Nevertheless, they argue that this right extends only to meritorious, or at least nonfrivolous, suits, and that the district court's dismissal of Bell's underlying civil rights claims on summary judgment demonstrates that his suit was not protected conduct.

Defendants rely on this court's decision in *Herron*, 203 F.3d at 415. In *Herron*, an inmate claimed that prison guards retaliated against him after he filed a suit under the Religious Freedom Restoration Act ("RFRA"). After the Supreme Court found the RFRA unconstitutional in *City of Boerne v. Flores*, 521 U.S. 507 (1997), the district court dismissed the plaintiff's suit as frivolous. *Herron*, 203 F.3d at 413. On appeal, a panel of this court dismissed the retaliation claim, finding that the inmate's RFRA suit was not protected conduct because the district court had dismissed the entire complaint as frivolous. *Id.* The *Herron* court noted that "[a]n inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf." *Id.* at 415. The court explained, however, that "[t]his right is protected . . . only if the grievances are not frivolous. Thus, [the plaintiff's] pursuit of legal claims . . . was protected conduct only to the extent that the underlying claims had merit." *Id.* (citing *Lewis v. Casey*, 518 U.S. 343, 353 n.3 (1996)).

Defendants' argument is without merit. The question of whether Bell's initial civil rights lawsuit constituted protected conduct was conclusively resolved in *Thaddeus-X*, 175 F.3d at 396 n.12. As noted above, *Thaddeus-X* addressed several

that conduct; and (3) there is a causal connection between elements one and two — that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

175 F.3d at 394. "Although the elements of a First Amendment retaliation claim [are] constant, the underlying concepts that they signify will vary with the setting — whether activity is 'protected' or an action is 'adverse' will depend on context." *Id.* at 388.

### a. Adverse Action

The district court dismissed Bell's claim on the grounds that he had failed to present sufficient evidence to satisfy the second prong of the *Thaddeus-X* test, insofar as the court discerned that the defendant had "not presented evidence that would allow a jury to conclude that a person of ordinary firmness . . . would have been deterred from asserting constitutionally protected rights by the events of June 6 and June 20, '94." J.A. at 320. We conclude that the district court misapplied the standard for adverse action set forth in *Thaddeus-X* and consequently erred in granting judgment as a matter of law to the defendants on this issue.

In *Thaddeus-X*, we explained that "government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." 175 F.3d at 386. Nevertheless, we also determined that some adverse actions are so de minimis that they do not give rise to constitutionally cognizable injuries. *Id.* at 396. Accordingly, we held that an official action will be deemed "adverse" only if it could "'deter a person of ordinary firmness' from the exercise of the right at stake." *Id.* (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). Although the "'[effect on freedom of speech] need not be great in order to be actionable,'" we explained that "'[i]t would trivialize the First Amendment'" to allow plaintiffs to bring First Amendment retaliation claims for *any* adverse action no matter how minor. *Id.* at 397 (quoting *Bart*, 677 F.2d at

625)).  Whether a retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights is a question of fact.  *See id.* at 398-99; *Davidson v. Chestnut*, 193 F.3d 144, 150 (2d Cir. 1999) (noting that question of whether one-day denial of inmate's exercise opportunities was de minimis was "factual in nature").

Our discussion of the "adverse action" requirement in *Thaddeus-X* makes it clear that, in most cases, the question of whether an alleged retaliatory action poses a sufficient deterrent threat to be actionable will not be amenable to resolution as a matter of law:

> We emphasize that while certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out *only inconsequential actions*, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment.

*Thaddeus-X*, 175 F.3d at 398 (emphasis added); *see also Bart*, 677 F.2d at 625.  Thus, unless the claimed retaliatory action is truly "inconsequential," the plaintiff's claim should go to the jury.  *Thaddeus-X*, 175 F.3d at 398.

Applying this standard in *Thaddeus-X*, a majority of the en banc court decided to remand Bell's retaliation claims to the district court for determination of whether "there is a genuine issue of material fact regarding the deterrent effect of the claimed deliberate harassment and cold meals that would continue unless and until he dropped his lawsuit against the warden."  *Id.* at 399.  In so holding, the majority of the en banc court rejected the argument of the dissenters that these allegations were insufficient as a matter of law to deter an inmate from pursuing a lawsuit.  *Id.* at 403 (Suhrheinrich, J., dissenting); *see also id.* at 408 (Kennedy, J., dissenting).  In contrast to Bell's complaints, which presented a close case, the en banc court observed that it "need not pause for long in the case of plaintiff X:  his allegations, if true, certainly meet the standard.  Harassment, physical threats, and transfer to the area of the prison used to house mentally disturbed inmates,

Bell himself was not deterred from persisting in this lawsuit.  *Thaddeus-X* makes clear, however, that the adverseness inquiry is an objective one, and does not depend upon how the particular plaintiff reacted.   175 F.3d at 398; *accord Sanders v. St. Louis County*, 724 F.2d 665, 666 (8th Cir. 1983) ("It is not necessary that the inmate succumb entirely or even partially to the threat so long as the . . . retaliatory act was intended to limit the inmate's right of access [to the courts].").  The relevant question is whether the defendants' actions are "*capable* of deterring a person of ordinary firmness;" there is no requirement that the plaintiff show actual deterrence.  *Thaddeus-X*, 175 F.3d at 398 (emphasis added).  Defendants' argument would effectively foreclose all retaliation claims, since the fact that a claim was before the court would be conclusive proof that the plaintiff was not deterred.  We emphasize again that the "ordinary firmness" standard is "intended to weed out only inconsequential actions."  *Id.*  The factual question is whether the injury inflicted is so slight that it could not reasonably be expected to deter protected conduct.  The standard is not intended to foreclose relief to all but the superfirm plaintiffs, who are willing and able to persist in their suits in the face of retaliatory actions that would cause most plaintiffs to crumple.  Rather, the purpose of the standard is to avoid trivializing the First Amendment by eliminating suits based upon insignificant acts of retaliation.  *See Bart*, 677 F.2d at 625 ("It would trivialize the First Amendment to hold that . . . if the Mayor of Springfield had frowned at Miss Bart for running for public office he would be liable for damages . . . .").

In sum, we conclude that Bell's evidence is sufficient to demonstrate that the claimed retaliatory acts were not merely de minimis acts of harassment.  This is all that is required to reach a jury on the issue of whether the retaliatory actions could deter a person of ordinary firmness from engaging in protected conduct.

dietary supplements, as the price of petitioning the courts. *Id.* at 398.

The defendants have offered no authority to the contrary. Instead, they argue that the plaintiff failed to present expert testimony or other evidence about the deterrent effect the defendants' actions would have on an ordinarily firm prisoner in segregation. Defendants apparently contend that *Thaddeus-X* imposes a burden on the plaintiff to present independent witness testimony that a given set of actions would deter a hypothetical prisoner of ordinary firmness from engaging in protected conduct. The district court expressed similar ideas. Nothing in our opinion in *Thaddeus-X* or any subsequent case, however, suggests that separate testimony about the likely effects of certain actions on prisoners of ordinary firmness, in the abstract, is required. Our conclusion in *Thaddeus-X* that physical threats and a transfer to base level of segregation would be sufficient to deter a person of ordinary firmness from engaging in protected conduct, for example, was not based upon any independent testimony in the record predicting how an average prisoner would react to these actions. 175 F.3d at 398. This was a conclusion that could be drawn simply from the facts concerning the nature of the threats and the conditions of confinement on the base level. The plaintiff's evidentiary burden is merely to establish the factual basis for his claim that the retaliatory acts amounted to more than a de minimis injury. *Accord Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001) (holding that prisoner's evidentiary burden under "ordinary firmness" standard was to show that guards' references to him as an "informant" or "rat" "actually risked inciting other inmates against the [plaintiff]," and was not merely harmless name-calling). Once this threshold has been passed, it is up to the trier of fact to determine whether, under the circumstances, the acts were capable of deterring a person of ordinary firmness from engaging in the protected conduct. *Suppan v. Dadonna*, 203 F.3d 228, 234-35 (3d Cir. 2000).

Defendants further argue that Bell cannot prove that their actions were sufficient to deter protected conduct, given that

especially combined with the conditions allegedly present there, would likely have a strong deterrent effect." *Id.* at 398; *see also Herron v. Harrison*, 203 F.3d 410, 416 (6th Cir. 2000) (holding that committing prisoner to administrative segregation for five days was adverse).

Based upon the foregoing principles, we conclude that the district court erred in ruling that Bell had presented insufficient evidence to show that the defendants' actions could deter a person of ordinary firmness from engaging in protected conduct. Initially, we note that a number of cases from other circuits have held that confiscating an inmate's legal papers and other property constitutes sufficient injury to support a First Amendment retaliation claim. *See Penrod v. Zavaras*, 94 F.3d 1399, 1404 (10th Cir. 1996) (reversing grant of summary judgment to defendants on inmate's claim that guards conducted harassing cell searches, seized legal materials, refused to provide inmate with hygiene items, and transferred inmate to segregation in retaliation for suit against prison officials); *Green v. Johnson*, 977 F.2d 1383, 1389-91 (10th Cir. 1992) (holding that inmate's allegation that guards destroyed his legal materials in retaliation for his filing of suits and grievances stated a cognizable First Amendment claim); *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986) (same); *Hall v. Sutton*, 755 F.2d 786, 787-88 (11th Cir. 1985) (holding that inmate alleged sufficient facts to state a claim of First Amendment retaliation based upon the alleged confiscation of his tennis shoes in retaliation for a prior lawsuit against prison officials); *see also Zimmerman v. Tribble*, 226 F.3d 568, 573-74 (7th Cir. 2000) (reversing dismissal of claim that prison law librarian repeatedly denied prisoner access to the prison law library in retaliation for protected conduct). In *Wright*, the Eleventh Circuit determined that a prisoner had alleged sufficient injury to state a First Amendment retaliation claim by asserting that correctional officers conducted a retaliatory search of his cell and that "[i]n the course of the search, [the defendants] destroyed seven of [the plaintiff's] photographs and some legal papers. . . . [and] also seized legal pleadings concerning [the plaintiff's] challenge to his conviction and a law book,"

which were never returned. *Wright*, 795 F.2d at 965. The court concluded that the plaintiff had "sufficiently alleged facts bringing actions that might not otherwise be offensive to the Constitution, such as the search itself or the confiscation and destruction of [legal and] nonlegal materials . . . , within the scope of the Constitution by alleging that the actions were taken in retaliation for filing lawsuits and administrative grievances." *Id.* at 968. Although *Wright* did not explicitly consider the "ordinary firmness" question, the court applied essentially the same well-established principles of First Amendment retaliation law that formed the basis for this court's decision in *Thaddeus-X*.

In addition, we have previously suggested in dicta that a retaliatory cell search and seizure of an inmate's legal documents satisfies the adverse action prong of the *Thaddeus-X* test. *Walker v. Bain*, 257 F.3d 660, 664 (6th Cir. 2001), *cert. denied*, 122 S. Ct. 2291 (2002). In *Walker*, a jury in a civil trial concerning an inmate's First Amendment retaliation claim returned special interrogatories finding that "both defendants improperly confiscated and removed [the plaintiff's] personal papers from his cell, that [the plaintiff's] previous filing of grievances and lawsuits was a substantial and motivating factor behind this conduct, but that the defendants' actions did not constitute an egregious abuse of power or otherwise shock the conscience." *Id.* at 672. A verdict initially was entered for the defendants based upon the jury's conclusion that the retaliatory acts were not conscience-shocking.[3] Shortly after the trial, the en banc court handed down its opinion in *Thaddeus-X*. Based upon the standard set forth in *Thaddeus-X*, the district court granted the plaintiff's motion to amend the judgment and entered a judgment in

---

[3] The district court's decision to require a finding of "conscience-shocking" behavior was prompted by this court's 1997 decision in *McLaurin*, 115 F.3d at 411. *Walker*, 257 F.3d at 672. Thus, for the purposes of our discussion in Part II.B.2.a. of this opinion, we note that the application of the "shocks the conscience" standard in *Walker* has little bearing on whether the "shocks the conscience" standard was regularly applied to inmate retaliation claims before *McLaurin*.

favor of the plaintiff on his retaliation claim. Although the entry of judgment for the plaintiff was not before us on appeal in *Walker*, we observed that "[u]nder the applicable standard [announced in *Thaddeus-X*], then, [the plaintiff] had proven a First Amendment retaliation violation" based on the retaliatory shakedown and seizure of documents. *Id.*

We find these cases persuasive, and consequently we hold that Bell has presented sufficient evidence to meet his burden under the adverse action prong of the *Thaddeus-X* test. Bell's evidence shows that the defendants twice left the plaintiff's cell in disarray, confiscated his legal papers without returning them, and stole the medical diet snacks that had been provided to him to alleviate his weight loss from AIDS. Bell testified that these actions caused him to fear leaving his cell and led him to worry that the guards were tampering with his food. If believed, this evidence tends to show that the defendants' actions had an intimidating effect on the plaintiff, and therefore could have deterred others. The fact that defendants repeatedly stole plaintiff's legal papers certainly had the potential to directly impede his pursuit of his claim, and may have caused others to believe that any efforts they might expend in preparing legal claims would be wasted since any materials they prepared could easily be destroyed or confiscated. In addition, a jury could infer that deliberately depriving a prisoner of dietary supplements designed to ameliorate the weight-loss effects of a deadly disease like AIDS could deter a person of ordinary firmness from pursuing his or her legal rights. These actions are certainly more severe than the threats of cold food and noncooperation by the prison guards that plaintiff Bell alleged in *Thaddeus-X*. We think that Bell's evidence at least is sufficient to show that the actions taken toward Bell were not "inconsequential." *Thaddeus-X*, 175 F.3d at 398. Although it is true that "the definition of adverse action is not static across contexts" and "[p]risoners may be required to tolerate more than public employees [and] . . . average citizens," we see no basis for concluding that prisoners should be required to tolerate the theft of their property, including legal documents and medical