**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0493n.06
Filed: July 13, 2007

No. 06-1476

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DR. SAMMIE E. HARRIS, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| DETROIT PUBLIC SCHOOLS et al., | ) | |
| | ) | **O P I N I O N** |
| **Defendants-Appellees.** | ) | |
| _____ | ) | |

Before: KEITH, BATCHELDER, and MOORE, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Plaintiff-Appellant Dr. Sammie E. Harris ("Harris") sued Defendant-Appellee Detroit Public Schools ("DPS") and several individual DPS employees in the United States District Court for the Eastern District of Michigan, alleging violations of the First and Fourteenth Amendments and 42 U.S.C. § 1983 and asserting various state-law claims. The district court declined to exercise supplemental jurisdiction over Harris's state-law claims. DPS subsequently moved for summary judgment on all of Harris's federal claims, and the district court referred the motion to a magistrate judge, whose Report and Recommendation ("R & R") suggested that the motion be granted. Neither party filed objections to the R & R, and the district court subsequently adopted it. Harris now appeals the district court's grant of summary judgment. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

# I. BACKGROUND

Harris was the principal of DPS's Northern High School ("NHS") from August 2000 until June 30, 2004. His employment was governed by a year-to-year Employment Agreement ("the Agreement," or "the contract"), which provided that Harris was an at-will employee whose employment could, at any time, be terminated by DPS's Chief Executive Officer ("CEO"), "at his/her sole discretion with or without cause, and with or without notice subject to the terms of this Agreement." J.A. at 36 (Agreement at 1 ¶ 3.1).

The Agreement also provided for automatic renewal "annually if Employee does not receive notice of non-renewal." J.A. at 41 (Agreement at 6 ¶ 16). It required Harris "to notify the District in writing by February 1 of each year if [he] does not wish for the contract to rollover [sic] to the following year" and "to give the District 60 days['] written notice prior to terminating this contract." *Id.* The Agreement could be amended only "by a written document signed by both parties." J.A. at 43 (Agreement at 8 ¶ 21); *see also* J.A. at 36 (Agreement at 1 ¶ 3.1) ("No modification to this [at-will employment] provision shall be binding unless expressed in writing and signed by the [DPS] CEO.").

Harris claims that he discovered in April 2001 that NHS's bookkeeper had engaged in improper accounting practices and, as a result, that funds were missing. Harris then requested, and DPS performed, an audit of NHS's books dating back to 1998, which confirmed that thousands of dollars were unaccounted for. The bookkeeper resigned in June 2001, upon learning of the audit, and Harris assigned social-studies teacher Richard Davis ("Davis") to serve as interim bookkeeper, but later removed Davis from the bookkeeping position and returned him to the classroom after the Detroit Federation of Teachers complained about Davis's reassignment. DPS did not approve the hiring of a permanent NHS bookkeeper until October 31, 2003.

2

On December 30, 2003, Defendant-Appellee David Porter ("Porter"), NHS's Executive Director, informed Harris that Davis had reported financial irregularities relating to NHS's "Sign-A-Rama" program. DPS then undertook a follow-up audit to investigate Davis's allegations. On January 21, 2004, while the audit was still ongoing, Harris sent a memorandum to Defendant-Appellee Debra Williams ("Williams"), DPS's Chief Human Resources Officer, stating his intention to retire at the end of the 2003-2004 school year:

> Be advised that I will retire at the end of June 2004. As a result of minimum sight in my right eye, it has become very difficult for me to keep up with reading the numerous daily correspondence, reports, and e-mails.
> It was my intent to work for an additional five years, however, I realized that I would not be able to give the students one-hundred percent in terms of leadership.
> Would you please advise as to what I need to do or what to submit to Human Resources to bring about closure. Also would you submit in writing how many hours I will be compensated for in terms of the 195 days of sick time accumulated.
> I thank you for your assistance. It is greatly appreciated.

J.A. at 255 (Jan. 21, 2004 Mem.).

Perrie Johnson ("Johnson"), DPS's Interim Director of Benefits and Compensation, responded to Harris's memorandum the following week:

> Dear Mr. Harris:
> In response to your January 21, 2004 memorandum to Debra F. Williams, Chief Human Resources Officer, and our telephone conversation on January 26, enclosed is Form 4149 Separation from Service Form. Once completed, you indicated that you would return the form to me for submission to Human Resources Operations.
> The Form 4149 is completed after you have notified the Office of Retirement Services (ORS) that you plan to retire and ORS has determined you are eligible for retirement. Once your eligibility is confirmed, the completed Form 4149 terminates your services with the Detroit Public Schools.
> In addition, this letter serves to confirm that a review of your leave accrual as of January 26, 2004 indicates that you would be paid for 35 days (280 hours) from your sick bank upon retirement.
> If you have further questions or need assistance, please contact me . . . .

J.A. at 257 (Jan. 27, 2004 Letter).

3

Also on January 27, 2004, DPS publicly released the results of its follow-up audit of NHS. The audit report concluded that "General School Fund expenditures were not in compliance with guidelines," "Monthly Bank Reconciliations and Trial Balances were not prepared monthly," and "Fundraiser Approvals and Profit and Loss Statements were not completed." J.A. at 173-74 (Follow-Up Audit Report at 4-5 ¶ 1). As a result, a total of $19,735.39 in NHS funds were not reconciled with bank statements—meaning that those funds "could not be traced to deposit into the school's checking account"—between July 1, 1998 and June 30, 2002. J.A. at 175 (Follow-Up Audit Report at 6 ¶ 2). The report recommended that the DPS Human Resources Department hold a formal hearing and, "[i]f warranted, . . . take appropriate action." J.A. at 170 (Follow-Up Audit Report at 6 ¶ 2). Moreover, the audit revealed that, "between October 1998 and April 2000," during a time period that, the report noted, was "prior to the current Principal's administration,"[1] "other expenditures, totaling $2,579.16, . . . were not in compliance with General School Fund guidelines." J.A. at 173 (Follow-Up Audit Report at 4 ¶ 1).

Harris submitted his Form 4149 on February 2, 2004, indicating that his reasons were "[h]ealth" and "lack of support regarding needed personnel." J.A. at 259 (Form 4149). The following day, the Detroit Free Press published an article titled "Audit: 5 high schools in Detroit misspent thousands." J.A. at 261. The article did not mention Harris by name but reported that "$19,735 was missing [from NHS accounts] from 1998 to 2002" and, "[i]n addition, $2,579 was misspent on items such as a refrigerator for the office, staff luncheons, flowers and gifts."[2] *Id.* One

---

[1]The report noted that Harris had been appointed NHS principal in September 2000. J.A. at 170 (Follow-Up Audit Report at 1).

[2]The latter amount was that reported by the auditor to have been misspent prior to Harris's appointment as principal.

4

day after the article was published, Harris sent a memorandum to Defendant-Appellee Kenneth E. Burnely ("Burnely"),[3] DPS's Chief Executive Officer, complaining that DPS's release of the audit report to the media constituted "character assassination." J.A. at 263 (Feb. 4, 2004 Mem. at 1). In the memorandum, Harris asked why the DPS news release did not mention the fact, known to DPS, that the missing and misspent funds had already disappeared by the time Harris became NHS principal.

DPS responded on February 6, 2004, with a letter notifying Harris that he was being placed on paid administrative leave "pending the final results of an investigation into the school's finances." J.A. at 272 (Feb. 6, 2004 Letter). The same day, Chief Human Resources Officer Williams sent a confidential memorandum to Chief Academic Officer and Defendant-Appellee Juanita Chambers ("Chambers"), "to again clarify the notification requirement set forth in the 2003-2004 school year administrative contracts." J.A. at 270 (Feb. 6, 2004 Mem.). The memorandum stated as follows:

> Once the notice of retirement is received by the district, steps will be taken to process the retirement of the administrator and fill the position being vacated by the administrator. It has been brought to my attention that administrators have been informed by their Executive Directors that they may change their minds after submitting the retirement form, and that there is a deadline date of May 1, 2004 by which to rescind the retirement notice. That information is incorrect. The administrator has no automatic right to withdraw the retirement notice. Once a retirement notice is received by the district, it will be within the school district's sole discretion whether to allow the retirement to be rescinded.
> Please provide the Executive Director of Accountability with this information so that consistent and correct information is communicated to the school based leadership in this regard.

*Id.*

---

[3]The parties' filings contain varying spellings of Burnely's name. We use the spelling that appears on our docket sheet and in Harris's complaint.

5

On February 13, 2004, The Detroit News reported Harris's suspension below the headline "Detroit district puts principal on paid leave." J.A. at 48. The article quoted DPS spokesman Mario Morrow as stating that "[n]o one is assumed guilty of anything . . . . It is just proper procedure." *Id.* (internal quotation marks omitted). It also mentioned Harris's assertion that "after June 2001 he didn't have a bookkeeper and used a teacher to keep track of the money. But in October 2003, he was given clearance by the district to hire a part-time accountant." *Id.* The article continued: "None of the [audits] have been referred to the prosecutor's office, but Morrow said that is still possible depending on further investigation." *Id.*

Two months later, on April 19, 2004, Harris sent a letter to Williams attempting to rescind his letter of retirement. Williams responded the following week, advising Harris that "rescissions are granted at the option of the District. Your request to rescind is denied." J.A. at 276 (April 26, 2004 Letter). Harris continued to receive his full salary through the end of his contract term (i.e., until June 30, 2004).[4]

Harris filed suit on May 27, 2004 against DPS and various of its employees in the United States District Court for the Eastern District of Michigan, alleging retaliation in violation of the First Amendment; deprivations of the procedural and substantive due process rights guaranteed by the Fourteenth Amendment; and violations of 42 U.S.C. § 1983.[5] DPS moved for summary judgment

---

[4]In fact, it appears that DPS continued to pay Harris until the second week of August. Although the record is not conclusive on this point, the extra pay appears to have constituted compensation for Harris's accrued sick leave.

[5]The complaint also alleges violations of 28 U.S.C. § 1343(a)(3) and various provisions of the Michigan constitution and laws. Section 1343 is, however, a purely jurisdictional provision, and Harris does not appeal the district court's refusal to exercise supplemental jurisdiction over his state-law claims. Accordingly, we do not address those claims. The parties' briefs also discuss the issue of qualified immunity as it applies to the individual Defendants-Appellants. Because, however, neither the magistrate judge's Report and Recommendation nor the district court's opinion addressed

on all of Harris's claims. The district court referred the motion to a magistrate judge, who issued a Report and Recommendation ("R & R") suggesting that it be granted as to all of Harris's federal claims. Neither party filed objections to the R & R, which the district court subsequently adopted.[6] Harris now appeals the grant of summary judgment.

## II. JURISDICTION

The district court possessed jurisdiction over Harris's federal claims pursuant to 28 U.S.C. § 1331. It declined to exercise jurisdiction over Harris's state claims pursuant to 28 U.S.C. § 1367(c)(2). We have jurisdiction over Harris's appeal from the district court's final order pursuant to 28 U.S.C. § 1291.

---

that issue, and because the district court correctly dismissed Harris's claims on the merits, we need not reach the question of qualified immunity. *See R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 440 (6th Cir. 2005) ("Because the Court upholds the district court's dismissal of the equal protection claim on its merits, it need not address whether the officers were entitled to qualified immunity.").

[6]The district court adopted the R & R on the ground that Harris had failed to object to it. J.A. at 396 (Dist. Ct. Order Accepting R & R at 2); *see also* FED. R. CIV. P. 72(b) (requiring the district court to review R & R de novo upon any party's objection). We have held that a party's failure to object to the recommendations of a magistrate judge constitutes a waiver of the right to appeal. *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). But "[t]he *Walters* court also made clear that a party shall be informed by the magistrate that objections must be filed within ten days or further appeal is waived." *Mattox v. City of Forest Park*, 183 F.3d 515, 519 (6th Cir. 1999) (internal quotation marks omitted) (noting that the Supreme Court approved the *Walters* rule in *Thomas v. Arn*, 474 U.S. 140 (1985)). When the R & R "contains no such notice to the plaintiffs, and therefore does not comport with the *Walters* rule[, w]e cannot presume that the plaintiffs have waived their argument that the substance of the report is still at issue." *Id.* at 519-20. In this case, moreover, DPS has not raised the waiver issue on appeal.

## III. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing the absence of any genuine issues of material fact. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). Once the movant has satisfied its burden, the nonmoving party must produce evidence showing that a genuine issue remains. *Id.*

The court must credit all evidence presented by the nonmoving party and draw all justifiable inferences in that party's favor. *Id.* The nonmovant must, however, "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Summary judgment is proper when the nonmoving party has had adequate time for discovery and yet "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. This Court reviews a district court's grant of summary judgment de novo. *See, e.g.*, *Spencer v. Bouchard*, 449 F.3d 721, 727 (6th Cir. 2006).

### B. First Amendment Retaliation

Harris first alleges that DPS, acting under the color of state law, violated 42 U.S.C. § 1983 by retaliating against him for exercising his First Amendment right to speak out on a matter of public concern.

> A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and

(3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Bell v. Johnson*, 308 F.3d 594, 602 (6th Cir. 2002) (internal quotation marks omitted). "Although the elements of a First Amendment retaliation claim are constant, the underlying concepts that they signify will vary with the setting—whether activity is 'protected' or an action is 'adverse' will depend on context." *Id.* at 602-03 (internal quotation marks and brackets omitted). Harris's retaliation claim fails because he cannot establish the second prong of the prima facie case.[7]

The evidence indicates that Harris voluntarily resigned his position as NHS principal; his argument to the contrary—that he merely *offered* to resign, and then rescinded that offer before it was accepted—is unavailing. Even if we construe Harris's January 21, 2004 letter to Williams (which begins, "Be advised that I will retire at the end of June 2004") as an offer to resign rather than a resignation, and further construe Johnson's response on behalf of DPS, requesting that Harris submit a Form 4149, as a counter-offer, it is clear that Harris accepted that counter-offer by submitting the form, whether that submission constituted performance (thus forming a unilateral contract) or a promise to retire (forming a bilateral contract). *See, e.g.*, *Combs v. Int'l Ins. Co.*, 354

---

[7]It is possible, in light of the Supreme Court's recent holding in *Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006), that Harris also cannot satisfy the first prong of the test by showing that he engaged in protected speech. *See id.* at 1960 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."); Appellant Br. at 39 ("Plaintiff-Appellant spoke out concerning school reform issues in a large gathering of principals, and strongly criticized Dr. Porter, and the manner in which administration policies impacted, adversely, his ability to manage Northern High School . . . ."). Although *Garcetti* was decided after the issuance of both the magistrate judge's R & R and the district court's opinion, it nonetheless applies to this direct appeal. *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 97 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review . . . ."). Because no party has relied upon or even cited *Garcetti*, however, and because the record does not conclusively establish that all of Harris's speech was encompassed by his job responsibilities, we decline to hold this issue dispositive.

F.3d 568, 599-600 & nn.17-18 (6th Cir. 2004) ("A unilateral contract consists of a promise or group of promises made by one of the contracting parties only, usually assented to by the other. . . . A bilateral contract consists of mutual promises, made in exchange for each other by each of the two contracting parties.").

Johnson's letter, which included a copy of Form 4149, plainly stated: "The Form 4149 is completed after you have notified the Office of Retirement Services (ORS) that you plan to retire and ORS has determined you are eligible for retirement. Once your eligibility is confirmed, *the completed Form 4149 terminates your services with the Detroit Public Schools*." J.A. at 257 (Jan. 27, 2004 Letter) (emphasis added). Accordingly, by signing and submitting the form, Harris performed the action necessary to accept what we assume, arguendo, to be DPS's counter-offer. Moreover, even if Harris had succeeded in rescinding his resignation, DPS's April 26, 2004 refusal to accept the rescission satisfied the rollover provision of the Agreement by notifying Harris, more than sixty days before the June 30, 2004 expiration of his contract term, that DPS did not intend to renew the contract for another year.

Harris also argues that his suspension constituted an adverse employment action. We have held, however, "that a suspension *with* pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action." *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) (internal quotation marks omitted). Accordingly, because Harris has failed to satisfy the prima facie requirements of a First Amendment retaliation claim, we **AFFIRM** the district court's grant of summary judgment in favor of DPS on that claim.

## C. Procedural Due Process

Harris next argues that the district court erred in granting summary judgment for DPS on Harris's claim that DPS violated his Fourteenth Amendment rights by placing him on paid leave without affording him due process of law. As "the Supreme Court stated in [*Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 544-55 (1985)]," however, "the suspension of [even] a tenured public employee *with pay . . .* avoid[s] due process problems entirely." *Jackson v. City of Columbus*, 194 F.3d 737, 749 (6th Cir. 1999), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (holding that the burden-shifting test established by *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), does not apply at the pleading stage). Furthermore, the evidence establishes that Harris's suspension did not constitute a constructive discharge. As explained supra, it is clear from the record that Harris voluntarily resigned effective June 30, 2004. Moreover, Harris himself admitted that his resignation was motivated not by the suspension or the post-audit investigation but, rather, by his "health" and the "lack of support regarding needed personnel." J.A. at 259 (Form 4149); *see also* J.A. at 192-94 (Harris Dep. at 52-54).

Harris also contends that DPS violated his due-process rights by refusing to allow him to rescind his resignation, thereby effectively terminating his employment, under circumstances that tarnished his professional reputation. Because Harris voluntarily resigned, however, he cannot satisfy the "stigma-plus" standard established by *Paul v. Davis*, which requires a plaintiff to demonstrate the infringement of "some more tangible interest[]" than reputation alone, "such as employment." 424 U.S. 693, 701 (1976). In addition, Harris's failure to request a name-clearing hearing precludes him from asserting such a claim. *Quinn v. Shirey*, 293 F.3d 315, 323 (6th Cir.) ("[A] plaintiff must request and be denied a name-clearing hearing in order to have been deprived of a liberty interest without due process."), *cert. denied*, 537 U.S. 1019 (2002). Accordingly,

because Harris has not established a deprivation of a constitutionally protected interest, we **AFFIRM** the district court's grant of summary judgment in favor of DPS on Harris's procedural due process claim.

**D. Substantive Due Process**

Harris also alleges that DPS unconstitutionally deprived him of his protected contractual interest in continued employment. As support for this claim, he relies primarily on his contention that he did not resign as NHS principal. For the reasons set forth supra, that argument fails. Even if Harris had established the deprivation of a contractual right, moreover, "[t]he substantive Due Process Clause is not concerned with the garden variety issues of common law contract"; that is, because Harris's contractual interest, if any, in his employment may be "redressed adequately in a state breach of contract action, [it] is simply not a proper subject of federal protection under the doctrine of substantive due process." *Bowers v. City of Flint*, 325 F.3d 758, 763-64 (6th Cir. 2003) (internal quotation marks and citation omitted).

> [I]n light of the fact that governments breach contracts virtually every day without dire consequences ensuing to the human dignity or basic autonomy of the promisees . . . . in the usual breach of contract case such as this, failure to meet contractual obligations cannot be equated with the sort of injustice inherent in egregious abuse of government power.

*Id.* at 765-66 (Moore, J., concurring) (internal quotation marks and brackets omitted). Accordingly, we **AFFIRM** the district court's grant of summary judgment in favor of DPS on Harris's substantive due process claim.

**E. Section 1983**

Finally, Harris asserts that the district court erred in granting summary judgment in favor of DPS on his claims arising under 42 U.S.C. § 1983. "Because Section 1983 is not itself a source of substantive rights, but only a method for vindicating federal rights elsewhere conferred, a plaintiff

12

must set forth specific constitutional grounds for asserting a Section 1983 claim." *Adair v. Charter County of Wayne*, 452 F.3d 482, 492 (6th Cir. 2006), *cert. denied*, 75 U.S.L.W. 3368 (U.S. Mar. 19, 2007) (No. 06-912). The section of Harris's brief discussing § 1983 does not assert any independent right not discussed above. Accordingly, we need not separately address it.

## IV. CONCLUSION

Because Harris cannot establish a prima facie retaliation claim under the First Amendment or the deprivation of a constitutionally protected interest sufficient to trigger due-process protections, and because 42 U.S.C. § 1983 does not create substantive rights, we **AFFIRM** the district court's grant of summary judgment in favor of DPS on all of Harris's federal claims.