RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0216p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

GERALD SENSABAUGH,

　　　　　　　　　　　　　　*Plaintiff-Appellant*,

　　　*v.*

KIMBER HALLIBURTON, Individually and in her official capacity as Director of Schools; WASHINGTON COUNTY BOARD OF EDUCATION,

　　　　　　　　　　　　　　*Defendants-Appellees*.

No. 18-6329

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 2:18-cv-00011—Pamela Lynn Reeves, Chief District Judge.

Decided and Filed:  August 27, 2019

Before:  ROGERS, BUSH, and LARSEN, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:**  M.E. Buck Dougherty, DUNCAN, HATCHER, HOLLAND & FLEENOR, P.C., Chattanooga, Tennessee, for Appellant.  Jeffrey M. Ward, MILLIGAN & COLEMAN PLLP, Greeneville, Tennessee, for Kimber Halliburton in her individual capacity.  Samuel K. McPeak, HERRIN, MCPEAK & ASSOCIATES, Johnson City, Tennessee, for Appellees Washington County Board of Education and Kimber Halliburton in her official capacity.

_____

### OPINION

_____

LARSEN, Circuit Judge.  Gerald Sensabaugh, the former head football coach at David Crockett High School in Washington County, Tennessee, made two Facebook posts expressing his concerns about the conditions and practices of schools within the Washington County School

District.  He claims that he was fired as a result.  He sued School Director Kimber Halliburton, raising a First Amendment retaliation claim, and the Washington County Board of Education (the Board), raising a municipal liability claim.  The district court granted summary judgment to Halliburton because Sensabaugh had failed to show that Halliburton had violated his constitutional rights.   And because Sensabaugh had failed to establish an underlying constitutional violation, his municipal liability claim against the Board also failed.   For the reasons stated, we AFFIRM.

I.

Sensabaugh became head football coach at David Crockett High School in 2017.  The school is within the Washington County School District and is overseen by the Board.  Halliburton is the Director of Schools for the Washington County School District.  Sensabaugh's immediate supervisor was Athletic Director Josh Kite, and his ultimate supervisor was Principal Peggy Wright.

On September 22, 2017, Sensabaugh visited an elementary school within the district.  The visit was unrelated to his job.  After the visit, Sensabaugh posted on Facebook, decrying the conditions of the elementary school.  His post included photos of the classroom, and one photo showed the faces of several students.  Upon seeing the post, the elementary school principal contacted the district's Director of Human Resources, Susan Kiernan; the principal relayed his concern that the posts might violate the law or school policy because the school might not have obtained parental consent to show the students' faces.  Kiernan relayed these concerns to Wright and Halliburton.

Halliburton, believing "that the public posting of a photo showing a child's face could be violative of both the [Board's] policy and the Family Educational Rights and Privacy Act," contacted the Board's attorney, Thomas Seeley.  Wright and Halliburton tried to call Sensabaugh to "instruct him to immediately remove any photo showing a child's face—but not any posts or other content."  But Sensabaugh did not answer the calls.  Halliburton did briefly communicate with Sensabaugh by text message that evening.  So did Wright, whose text told Sensabaugh to remove the photos from Facebook.  Sensabaugh did not comply.

Two days later, Sensabaugh again posted on Facebook; this post discussed his concerns with prisoners working at the high school. Halliburton texted Sensabaugh after reading the post, telling him: "I see you've posted something else before knowing all the facts. Uncertain why you are not taking my calls. I really would like to speak to you." Later that day, Wright and Halliburton spoke with Sensabaugh on the phone. According to Halliburton:

> Wright and I spoke to Sensabaugh by phone, and attempted to address the safety concerns that Sensabaugh raised and again requested that he remove any photo(s) of the Jonesborough Elementary School children from Facebook; we advised Sensabaugh that he did not need to take down the post, just the photo(s) of the students . . . . During this phone conversation, Sensabaugh yelled at us and told us that he was not taking the photo down. Then, he hung up on us.

Wright recounted the telephone call similarly, noting that Sensabaugh "repeatedly interrupted us and he yelled at us" and that "Halliburton and I could not believe that Sensabaugh would speak to his supervisors in this manner." Halliburton also explained, "During my more than fifteen years as a supervisor[] in the education field, I have never had an employee speak to me the way that Sensabaugh spoke to Wright and me in that September 24, 2017 phone call." Sensabaugh explained the conversation as follows:

> It was a very heated phone conversation and Director Halliburton and Principal Wright threatened me with my job as head football coach. Director Halliburton and Principal Wright both told me that they "could make it where I would never coach football again anywhere."

After the conversation, Sensabaugh sent a text message to Halliburton that read: "Just let me know the next step. Fire me or deal with it."

Based on Sensabaugh's conduct during the phone call, Halliburton consulted attorney Seeley on how to proceed with "some level of corrective action." Although Halliburton wanted to fire Sensabaugh, Seeley recommended "a letter to address the issues with him and give him a chance to correct his behavior." Wright and Halliburton drafted a Letter of Guidance, which addressed not only Sensabaugh's failure to remove the photos from Facebook and his conduct during the phone call, but other alleged misconduct, including his use of profane language with students and his requiring a student to practice while injured. The letter again directed Sensabaugh to remove the photos from Facebook but stated, "At no time did we ask you to

delete any of your comments or opinions on social media. You have the right to comment on matters of public interest on social media." The letter concluded, "Failure to follow my directives may lead to discipline up to and including termination as our football coach." After receiving the letter, Sensabaugh removed the photos from Facebook.

Wright gave Sensabaugh the Letter of Guidance at a meeting on October 6, 2017, during which Wright claims that Sensabaugh "became agitated and began pacing back and forth. As the meeting progressed, he became belligerent and confrontational." According to Wright, "Sensabaugh interrupted my attempt to read him the letter, but ultimately let me finish reading it." "At the meeting, Sensabaugh "accused his immediate supervisor, [Athletic Director] Kite, of coming to work 'high' on the prescription medication, Oxycodone." Wright stated, "Sensabaugh threatened to expose Kite to the media if we took any further action related to Sensabaugh's conduct." At this same meeting, Sensabaugh also claimed knowledge of a student's having brought a gun to school. In a subsequent interview, Sensabaugh stated that the claim was hypothetical and meant to illustrate that allegations of wrongdoing are easy to make but difficult to prove. However, Sensabaugh acknowledged having heard an unsubstantiated rumor that a student brought either a shotgun or BB gun to school. Wright later explained: "I was very concerned that Sensabaugh waited until his own conduct was being addressed to bring up something that should have been reported immediately."

After the Letter of Guidance meeting, Sensabaugh went straight to the cafeteria where he confronted an athletic trainer and the injured student whom Sensabaugh had allegedly forced to practice. Later that night, Sensabaugh allegedly directed profanity toward his football players during a game, in direct violation of the Letter of Guidance. And Sensabaugh allegedly went around proclaiming "loudly so that everyone around, including students, could hear: 'Josh Kite has a drug problem and has offered me Oxycodone. He carries it around the school and I don't care who hears me.'" During a later independent investigation, Sensabaugh denied having directed profanity at the students that night and making such statements about Kite.

Sensabaugh's conduct following the Letter of Guidance meeting prompted Wright to contact attorney Seeley to report her concern "that Sensabaugh posed a threat to the safety of the students and staff." Although Wright initially wished to fire Sensabaugh, she and Halliburton

ultimately agreed with Seeley's recommendation to instead issue a Letter of Reprimand. The Letter of Reprimand recounted the incidents leading up to its issuance, placed Sensabaugh on administrative leave pending a full investigation by an independent law firm, and warned Sensabaugh that termination of his employment was possible. Wright testified that "Sensabaugh was extremely rude and insubordinate" when she read him the Letter of Reprimand and explained that "[i]f Sensabaugh w[ere] not already being suspended and investigated, [she] would have immediately recommended his termination based upon his conduct."

An independent law firm painstakingly investigated the alleged misconduct, interviewing "seventeen different witnesses who were identified as potentially having relevant knowledge or information" and reviewing scores of documents and text messages. This included a lengthy interview with Sensabaugh. The investigators concluded that Sensabaugh had used profanity and had failed to follow instructions to remove the photos from Facebook until after the Letter of Guidance meeting. They determined that Sensabaugh had been unprofessional and insubordinate during the Letter of Guidance and Letter of Reprimand meetings as well as, afterward, in his retaliation against the athletic trainer and student-athlete in the cafeteria. And they found the allegations of Sensabaugh's failure to report safety concerns and to follow orders regarding practicing injured players partially substantiated. The investigators' report concluded:

> [W]e find that Sensabaugh engaged in unprofessional, insubordinate, threatening and retaliatory behavior towards supervisors, staff, and students. Further, we find that Sensabaugh's actions and statements intimidated, demeaned, and undermined both his co-workers and his supervisors. We find that, in light of this conduct, Principal Wright was justified in placing Sensabaugh on administrative leave on October 10, 2017.
>
> Moreover, it is inconceivable to these investigators that anyone could repeatedly speak to his or her supervisors and co-workers in such a belligerent and confrontational manner and still expect to maintain an employment relationship. Furthermore, we believe that Sensabaugh's lack of civility and failure to treat others with dignity and respect forecloses any possibility of reinstatement. In the investigators' opinions, Sensabaugh's behavior warrants his permanent removal from the position of Head Football Coach at DCHS, and we recommend that Sensabaugh's employment with DCHS be terminated.

While the investigation was ongoing, Sensabaugh filed suit against Halliburton and the Board. Just over a month later, Halliburton notified Sensabaugh that the independent

investigators had completed their investigation and had recommended his termination. Halliburton summarized the investigators' findings and recommendation in a letter, but offered the following:

> Before I make a final decision regarding your continued employment, I wish to give you every opportunity to respond to Attorney Baker's investigation. . . . I am asking you to provide me with any written statements or other evidence you wish me to consider in your defense, whether in rebuttal to Attorney Baker's findings or in support of a less severe punishment. Alternatively, you may request a meeting with me to present your defense and to explain why I should not terminate you.

Sensabaugh never responded to Halliburton's letter, and Halliburton terminated Sensabaugh's employment on March 15, 2018.

Sensabaugh then amended his complaint to include claims based on his termination. Halliburton moved for summary judgment based on qualified immunity, and the Board moved to dismiss for failure to state a claim. The district court granted the motions, holding that Sensabaugh had not shown a violation of his First Amendment rights, and without an underlying constitutional violation, Sensabaugh's claim against the Board also failed. Sensabaugh appealed.

## II.

Sensabaugh argues that Halliburton retaliated against him for exercising his First Amendment right to speak in the form of two Facebook posts. To prevail on his First Amendment retaliation claim, Sensabaugh must show:

> (1) [he] engaged in protected conduct; (2) an adverse action was taken against [him] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by [his] protected conduct.

*Bell v. Johnson*, 308 F.3d 594, 602 (6th Cir. 2002) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). If he makes this showing, "the burden then shifts to the employer to demonstrate 'by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct.'" *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012) (quoting *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir.

2010)).  If the employer makes such a showing, "summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant."  *Id.* at 294–95 (quoting *Eckerman*, 636 F.3d at 208).  Halliburton disputes Sensabaugh's First Amendment retaliation claim and also asserts qualified immunity.  When a state official raises a qualified immunity defense, the plaintiff must show the violation of a clearly established constitutional right.  *Harris v. Klare*, 902 F.3d 630, 637 (6th Cir. 2018).

The district court concluded that Sensabaugh could not show that the Letter of Guidance, the Letter of Reprimand, or his termination violated the First Amendment.  While there is no dispute that Sensabaugh's Facebook posts constituted protected speech,[1] the district court determined that the Letters did not constitute adverse actions, and that Sensabaugh could not show any causal connection between the Facebook posts and his termination.  We address these conclusions in turn.

*Letter of Guidance and Letter of Reprimand.*  Sensabaugh first challenges the district court's determination that the Letters of Guidance and Reprimand did not constitute adverse actions.  To establish an adverse action for First Amendment retaliation purposes, "a plaintiff must show that the action 'would chill or silence a person of ordinary firmness from future First Amendment activities.'"  *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014) (quoting *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007)).  But "[i]t is not necessarily true . . . that every action, no matter how small, is constitutionally cognizable" as an "adverse action."  *Thaddeus-X*, 175 F.3d at 396.  In the employment context, "[t]he term 'adverse action' has traditionally referred to actions such as discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote."  *Dye*, 702 F.3d at 303 (alteration omitted) (quoting *Handy-Clay v. City of Memphis*, 695 F.3d 531, 545 (6th Cir. 2012)).

We agree with the district court that the Letter of Guidance was not an adverse action. The Letter had no detrimental effect on Sensabaugh's job as head football coach.  As the district

---

[1]Sensabaugh does not contend that the photos he posted to Facebook were protected by the First Amendment or that Halliburton's request to have the photos removed violated his First Amendment rights.

court noted, "[t]he issuance of the Letter of Guidance did not itself impose any discipline or alter Sensabaugh's employment conditions in any way." Instead, it imposed directives that Sensabaugh had to follow to avoid discipline. The Letter expressly permitted Sensabaugh to maintain his First Amendment activities, by keeping the posts on Facebook, and notified Sensabaugh that he could post comments on social media in the future. As such, we cannot conclude that the Letter of Guidance "would chill or silence a person of ordinary firmness from future First Amendment activities." *Benison*, 765 F.3d at 659.[2]

The same goes for the Letter of Reprimand. The Letter of Reprimand amounted to a suspension with pay pending investigation by outside counsel. Several panels of this court have determined that a suspension with pay does not constitute an adverse action. *See, e.g.*, *Ehrlich v. Kovack*, 710 F. App'x 646, 650 (6th Cir. 2017) (First Amendment retaliation claim); *Harris v. Detroit Pub. Schs.*, 245 F. App'x 437, 443 (6th Cir. 2007) (same); *Peltier v. United States*, 388 F.3d 984, 988–89 (6th Cir. 2004) (Title VII discrimination claim). Sensabaugh makes no attempt to grapple with this caselaw on appeal; yet it is his burden to show the violation of a constitutional right in order to overcome Halliburton's assertion of qualified immunity. *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015). Sensabaugh has not shown that the Letter of Reprimand constitutes an adverse action.

---

[2]Sensabaugh also argues that Halliburton and Wright's threat to ensure that he "would never coach football again anywhere" constitutes an adverse action, either separately or when considered in conjunction with the Letter of Guidance. The district court did not consider the threat, perhaps because Sensabaugh's complaint identified only the Letter of Guidance, the Letter of Reprimand, and his termination as adverse actions. In any event, threats alone are generally not adverse actions for retaliation purposes. *See Hornbeak-Denton v. Myers*, 361 F. App'x 684, 689 (6th Cir. 2010) (citing *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004)). Does the threat in conjunction with the Letter of Guidance make the Letter an adverse action? It does not. Despite any statements made during a "heated" phone conversation, the Letter of Guidance, issued a few days later, would have had no detrimental effect on Sensabaugh's job, provided that he complied with reasonable requests related to his professionalism and unrelated to the Facebook posts. Accordingly, even considering the Letter of Guidance in light of the alleged threat, the Letter does not constitute an adverse action. *See Thaddeus-X*, 175 F.3d at 396.

*Termination.* There is no dispute that Sensabaugh's firing was an adverse action. But the district court found no causal connection between Sensabaugh's Facebook posts and his termination. We agree.

To show causation, Sensabaugh "must demonstrate 'that the speech at issue represented a *substantial or motivating* factor in the adverse employment action.'" *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (quoting *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003)). "A 'motivating factor' is essentially but-for cause . . . ." *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007).[3]

Sensabaugh's causation argument rests largely on temporal proximity. Without a doubt, the Letter of Guidance and the Letter of Reprimand came shortly after the Facebook posts. The termination, however, came almost six months later. And even if we agreed that temporal proximity could provide a suggestion of causation here, temporal proximity alone is rarely, if ever, sufficient to establish causation. *See Vereecke*, 609 F.3d at 400. There generally must be other indicia of retaliatory conduct. *Id.*

We see none here. At no time leading up to the termination did Halliburton ask or require Sensabaugh to remove the Facebook posts. In fact, both the Letter of Guidance and Letter of Reprimand explicitly acknowledged Sensabaugh's right to comment on public concerns through social media. Moreover, a thorough independent investigation preceded Sensabaugh's termination; that investigation concluded that the misconduct allegations were substantiated in full or in part, and that the misconduct supported termination. Sensabaugh casts no doubt on the impartiality of the investigation. And the evidence shows that Halliburton relied on the investigation when firing Sensabaugh.

---

[3]In challenging the district court's causation determination, Sensabaugh argues that, pursuant to the balancing test set forth in *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), the defendants have failed to "demonstrate[] that they have an overriding interest in maintaining the efficiency of the WCSD schools that outweigh Coach Sensabaugh's protected speech." But the *Pickering* balancing test goes to the first element of a First Amendment retaliation claim—whether a public employee such as Sensabaugh engaged in constitutionally protected speech. *See Westmoreland v. Sutherland*, 662 F.3d 714, 718–19 (6th Cir. 2011). The defendants have conceded that the Facebook posts were constitutionally protected speech; accordingly, we need not employ *Pickering*.

Halliburton offered Sensabaugh an opportunity to respond to the investigation before she made any final decision. Sensabaugh was offered similar opportunities in the Letter of Guidance and the Letter of Reprimand. But he never responded or gave Halliburton reason to disbelieve the results of the independent investigation. And finally, Halliburton "relied upon the advice of the [Board's] attorney who agreed that termination was the proper course" in the circumstances.

In sum, when deciding to terminate Sensabaugh's employment, Halliburton relied on, among other things, the independent investigation, which went unrebutted by Sensabaugh, and the advice of the Board's attorney. There is no indication that Sensabaugh's Facebook posts played any part in the final decision; indeed, Halliburton repeatedly affirmed Sensabaugh's right to post them. Sensabaugh has not met his burden of showing that the Facebook posts were a substantial or motivating factor in his termination. *Leonard*, 477 F.3d at 355. Accordingly, he has not shown that Halliburton violated his constitutional rights. Halliburton is entitled to qualified immunity.

## III.

Sensabaugh also sued the Board, alleging municipal liability pursuant to *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). But because Halliburton did not violate Sensabaugh's First Amendment rights, the municipal liability claim also fails. *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) ("There can be no liability under *Monell* without an underlying constitutional violation.").

* * *

We AFFIRM the judgment of the district court in favor of the defendants.