NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0427n.06

Case No. 24-1155

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Sep 18, 2025
KELLY L. STEPHENS, Clerk

JULIE A. TAMM and ROSEANNA M. PRZYBYLSKI,

    Plaintiffs-Appellants,

v.

MILAN NERAD,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

O P I N I O N

Before: CLAY, WHITE, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. Julie Tamm and Roseanna Przybylski own a home in Lincoln Township near Diamond Lake, where they have enjoyed using their seasonal boat dock during the warmer months in Michigan for many years. But they have run into trouble with the Zoning Administrator for Lincoln Township, Milan Nerad, because of some of their historical practices involving the dock. Nerad issued Plaintiffs citations for the placement of their dock in 2023 under two township ordinances. Tamm and Przybylski then filed suit, alleging that Nerad issued the citations to retaliate against them for filing a previous lawsuit, in which they challenged the township's ordinances regulating residents' uses of the lake and shoreline. Their complaint in this case seeks declaratory relief on state preemption grounds and claims various constitutional and civil rights violations under both federal and state law. Nerad moved for summary judgment and partial judgment on the pleadings. The district court granted both motions, thereby resolving all

counts in Nerad's favor. Plaintiffs appeal. For the reasons below, we AFFIRM IN PART, REVERSE IN PART, and REMAND to the district court for further proceedings consistent with this opinion.

## I.

### A. Factual Background

Tamm and Przybylski's home in Lincoln Township overlooks the shore of Diamond Lake, where they keep a seasonal dock. Their property sits on Lots 84 and 85 of Reed's Diamond Lake Park subdivision. Directly across the road from their house is a small parcel of land called "West Park," which borders Diamond Lake and has been dedicated to the public for use as a park. (R. 41, Op. and Order, PageID 482). Plaintiffs and their family before them have kept a seasonal dock at Diamond Lake for decades. Historically, Plaintiffs have installed the dock at the water's edge in the summer months and then stored it on the shore at West Park during the winter months. Nerad is the Zoning Administrator for Lincoln Township in Newaygo County, Michigan. This lawsuit follows a previous federal lawsuit, *Tamm, et al. v. Nerad*, No. 1:21-cv-322 (W.D. Mich. Aug. 2, 2022) ("*Tamm I*"), that Tamm and Przybylski filed against Nerad and the Lincoln Township supervisor in their official capacities, and which ended in a binding consent judgment. Like *Tamm I*, this lawsuit challenges the enforcement of township ordinances against Plaintiffs' seasonal dock in West Park.

### 1. Township Ordinances

Tamm and Przybylski's dispute with Nerad can be traced back to 2020, when the township enacted new regulations that addressed, among other things, the permissible uses of the shore at West Park and Diamond Lake. Relevant here, the township introduced the Lincoln Township Waterfront Park Ordinance – II ("WPO II") (Ordinance No. 20-01) on February 20, 2020, as "an

ordinance to regulate two lakefront parks in Reed's Diamond Lake . . . and to provide penalties for the violation of such regulations."  (R. 35-3, Ordinances, PageID 408).  The two specified lakefront parks are "West Park" and "North Park."  (*Id.* at PageID 409).  As amended on October 21, 2021, the WPO II § 4.3 provides that:

> No dock, wharf, pier . . . or similar item shall be installed, stored, kept[,] or utilized on or at the Parks (or the shoreline or bottomlands thereof), except as follows: (a) With regard to West Park, no more than four (4) seasonal docks may be installed at the shoreland and bottomlands of West Park as follows: Lots 84, 85, 86 and 87 of the plat shall each be allowed one (1) seasonal dock.

(*Id.* at PageID 406).

On February 20, 2020, the township also enacted the Lincoln Township Lakes Road Ends and Access Easement Ordinance ("LREAEO") (Ordinance No. 20-05) as "an ordinance to regulate road ends and access easements at lakes within Lincoln Township."  (R. 35-2, Ordinances, PageID 401).  The LREAEO § 5 provides that:

> No permanent dock, pier or similar item shall be installed, kept or maintained on, at or in Diamond Lake. Every dock and pier (as well as any and all portions and parts thereof) and every shore station, boat hoist, swim raft and similar item shall be entirely removed from the waters of Diamond Lake during the time period from November 15 through the following April 15.

(R. 35-2, Ordinances, PageID 402).  Thus, because Tamm and Przybylski own Lots 84 and 85, the WPO II excepted them from parts of the dock prohibition.  And the LREAEO § 5 set forth the dates that their dock could lawfully be in the water as April 16 through November 14.

2.  *Tamm I* and the Consent Judgment

Tamm and Przybylski filed *Tamm I* against Nerad and the Lincoln Township supervisor in their official capacities in April 2021.  Nerad had placed notices on Plaintiffs' dock citing them for "no dock permit" and warning that "[a]ll persons acting contrary to this order . . . are liable to

arrest." (*Tamm I* Am. Compl., Ex. H, Case No. 1:21-cv-322, R. 10-8, PageID 114). In that lawsuit, Tamm and Przybylski challenged the WPO II and Nerad's enforcement of it as unlawful and unconstitutional.[1]

*Tamm I* ended in a binding federal consent judgment. As part of the consent judgment, the township agreed to pay Tamm and Przybylski $3,500; to amend the WPO II to remove certain restrictions[2]; and to adhere to the consent judgment's terms, including a provision stating that "[e]ach Lot is entitled to one (1) seasonal dock on the West Park." (R. 35-4, Consent Judgment, PageID 422). The consent judgment also provided that:

> Lincoln Township shall not challenge the ability of any owner(s) of the Lots to place a boat dock on the West Park subject to the provisions of this Consent Judgment, Lincoln Township Waterfront Park Ordinance – II . . . and any other applicable Lincoln Township ordinance.

(*Id.* at 419). In exchange, Plaintiffs agreed to dismiss all claims with prejudice, to be "subject to the provisions of this Consent Judgment [and] Lincoln Township Waterfront Park Ordinance – II," and to "compl[y] with any applicable Lincoln Township ordinance or state or federal law except as provided herein whereby this Consent Judgment controls." (*Id.*).

### 3. 2023 Enforcement Actions

Within six months of the entry of the consent judgment, Nerad ticketed Tamm and Przybylski's dock. He issued one citation (alternately "ticket") for an alleged violation of the WPO II and a second citation for an alleged violation of the LREAEO. The WPO II ticket was for "boat dock on park property off season" (Ticket 1091). (*Id.* at PageID 437).[3] And the LREAEO

---

[1] Plaintiffs also challenged the township's ability to regulate West Park, asserting that the township is not the fee simple owner of the land, only the trustee, at best.

[2] These included the removal of certain pet restrictions and noise restrictions at the West Park, for example.

[3] Nerad originally ticketed Plaintiffs under the WPO II for "boat dock stored on park property" (Ticket 1087 on January 20, 2023). But Nerad cited the wrong section of the township's ordinances and so the Newaygo County Court dismissed the ticket on March 30, 2023. Nerad issued Ticket 1091 that same day.

ticket was for "failure to remove dock from lake waters" (Ticket 1088). (*Id.* at PageID 436). Both offenses are civil infractions that carry fines. Under the WPO II, fines range from $100 to $500 for a first offense and from $200 to $2,500 for a second offense. Under the LREAEO, fines begin at $100 for a first offense and $200 for a second offense.

The parties dispute the facts underlying the issuance of Ticket 1088. Tamm and Przybylski argue that their seasonal dock was not in the lake waters but instead placed on the shoreland during the off-season, as they and their family have done "for decades." (ECF 13, Appellant Br., 6). Though they concede, in the alternative, that Nerad's ticketing may have been "based on the dock being slightly in water due to an unexpected winter lake level increase." (*Id.* at 24 n.12). Nerad contends that he issued the tickets because Plaintiffs' "dock was not completely removed from the water," in violation of WPO II ordinance provisions from which he did not believe Plaintiffs were exempt. (R. 29-5, PageID 309, ¶¶ 11, 17–18).

As for Ticket 1091, Tamm and Przybylski argue that they have a prescriptive right to store their dock on the shore of West Park in the winter, as they have done for decades. Conversely, Nerad interprets the WPO II as banning the storage of any private boat dock at the parks. Plaintiffs say the WPO II exempts them as the owners of lots 84 and 85 from the ban on storage. But they recognize that the county court (where the tickets are pending) will ultimately decide this question of statutory interpretation.

4. Alleged Harassment of Plaintiffs

Tamm and Przybylski assert that in addition to issuing them unwarranted tickets, Nerad also harassed them, intimidated them, and conducted himself in a manner that was "creepy," "unprofessional," and "mess[ed] with our quality of life at our home." (ECF 13, Appellant Br., 19, 23; R. 29-7, Przybylski Dep., PageID 351). For instance, Tamm and Przybylski both state that

Nerad blocked their driveway with his vehicle, and he sat on the neighbor's porch, facing their house, staring at them "for long periods of time." (R. 35-5, Tamm Decl., PageID 427–28, ¶¶ 9–13; R. 29-7, Przybylski Dep., PageID 355). And Przybylski further relayed that she and her spouse privately discussed selling the property because of Nerad's harassment. She also testified that "[w]hen [Nerad] was served with papers [in *Tamm I*] . . . he said something to the effect of, 'This can go in the recycle.'" (R. 29-7, Przybylski Dep., PageID 349). According to Tamm, "Milan Nerad is angry at Roseanna and I and is using his powers as an enforcement official against us" in retaliation for filing the *Tamm I* lawsuit, which "highlight[ed] his poor work performance." (R. 35-5, Tamm Decl., PageID 428, ¶¶ 12–13).

For his part, Nerad denies engaging in any harassing behavior. He states that Plaintiffs' Lincoln Township property does not have a driveway and that "[a]t no time did I ever block or intend to block Plaintiffs, and at no time have I ever been asked to move my truck." (R. 38-1, Nerad Suppl. Aff., PageID 466–67). Nerad declares that he has faithfully and consistently enforced the ordinances and has not treated Plaintiffs any differently than any other township citizen.

### B. Procedural Background

On May 2, 2023, Plaintiffs filed this federal lawsuit alleging six counts against Nerad, denominating their claims as follows: Count I—First Amendment Retaliation (42 U.S.C. § 1983) (official and personal capacity); Count II—*Llewellyn* Preemption (state-law claim); Count III—Reasonableness Challenge – *Square Lake* (state-law claim); Count IV—Selective Enforcement (Equal Protection) (§ 1983) (official and personal capacity); Count V—Fifth/Fourteenth Amendments Takings (§ 1983) (official capacity only); and Count VI—Inverse Condemnation (Mich. Const. art. 10, § 2 / U.S. Const. amend. V).

Nerad moved for partial judgment on the pleadings as to Counts II, III, V, and VI. And he later m oved for summary judgment on the First Amendment retaliation (Count I) and Fourteenth Amendment Equal Protection (Count IV) claims. The district court granted both motions and dismissed Plaintiffs' case with prejudice. Plaintiffs filed a timely notice of appeal. And we have jurisdiction under 28 U.S.C. § 1291 to review the district court's final judgment.

## II.     Motion for Summary Judgment

### A.  Standard of Review

We review a district court's grant of summary judgment de novo, construing the facts in the light most favorable to the nonmoving party. *See Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020). Summary judgment is proper when no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The central issue is whether the evidence presents a sufficient disagreement to require submission of Plaintiffs' claims to a jury, or whether the evidence is so one-sided that Nerad must prevail as a matter of law. *See id.* at 251–52.

### B.  First Amendment Retaliation

Tamm and Przybylski assert that Nerad was angered by their actions in bringing the *Tamm I* lawsuit and issued the tickets to retaliate against them mere months after that suit was resolved. They say no other resident received citations for similar conduct, and Nerad also harassed them at their home. Nerad counters that a First Amendment retaliation claim fails if there is probable cause to support prosecution, and Plaintiffs have not established the absence of probable cause, so qualified immunity may apply. He also argues that Plaintiffs' claim fails on the merits because

they have not shown adverse action or causation. Because the district court agreed with Nerad's latter arguments, it declined to consider qualified immunity. So we begin with the parties' arguments on the merits.

    1.  <u>Elements Analysis</u>

We analyze First Amendment retaliation claims under a burden-shifting framework. *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014). First, a plaintiff must make a prima facie showing that: (1) she was engaged in protected conduct; (2) the defendant took adverse action against her that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.*; *see also Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). If the plaintiff makes this showing, then the burden shifts to the defendant to demonstrate by a preponderance of the evidence that he would have engaged in the same action absent the protected conduct. *Benison*, 765 F.3d at 658; *see also Maben v. Thelen*, 887 F.3d 252, 267 (6th Cir. 2018).

Here, the parties rightly agree that Plaintiffs' prior lawsuit in *Tamm I* constituted protected conduct. *See Bell v. Johnson*, 308 F.3d 594, 607 (6th Cir. 2002). But they disagree on whether Plaintiffs have offered sufficient evidence to establish (1) adverse action and (2) causation. We conclude that Plaintiffs have offered evidence from which a reasonable juror could determine that there was both adverse action and causation.

    i.  *Adverse Action*

Because the district court concluded that Tamm and Przybylski's claim failed on the causation prong, it assumed without deciding that Nerad's conduct constituted adverse action. As discussed more fully below, however, Plaintiffs have set forth facts sufficient for a reasonable jury

to conclude they have established causation. So we consider here whether the district court's assumption on adverse action was correct. We conclude that it was.

We have previously described adverse action as conduct sufficient to "chill or silence a person of ordinary firmness from future First Amendment Activities." *Sensabaugh v. Haliburton*, 937 F.3d 621, 628 (6th Cir. 2019) (quoting *Benison*, 765 F.3d at 659). Plaintiffs argue that Nerad's issuance of the citations is sufficient to show adverse action. Meanwhile, Nerad maintains that his actions do not qualify as adverse action because he was merely enforcing the township ordinances.

Whether a defendant took an adverse action is usually a factual question for the jury. *Bell*, 308 F.3d at 603 ("[U]nless the claimed retaliatory action is truly 'inconsequential,' the plaintiff's claim should go to the jury." (quoting *Thaddeus-X*, 175 F.3d at 398)). As the district court noted, other district courts in this circuit have found that traffic tickets or civil infractions can constitute adverse actions because they represent "concrete consequences." *Hazel v. Quinn*, 933 F. Supp. 2d 884, 891 (E.D. Mich. 2013) (quoting *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003); *see also Leach v. Balint*, No. 18-11814, 2019 WL 4267584, at *5 (E.D. Mich. Aug. 9, 2019), *report and recommendation adopted*, No. 18-CV-11814, 2019 WL 4261165 (E.D. Mich. Sept. 9, 2019) (Concrete consequences "might include having points assessed against a driver's license, increased insurance rates, or even the stigma of a petty offense or civil infraction conviction."). And at least one of our sister circuits agrees. *See, e.g., Garcia*, 348 F.3d at 726 (holding that a reasonable jury could find that the issuance of four parking tickets totaling $35 in a two-month period would deter a person of ordinary firmness from exercising her First Amendment rights).

The question here is whether a reasonable juror could conclude that Nerad's issuance of the subject citations, accompanied as they are with the threat of hundreds to thousands of dollars in fines, would deter a person of ordinary firmness from filing a lawsuit challenging his conduct

as a government official. True, Plaintiffs themselves have not been deterred. After all, they have brought this second federal lawsuit against Nerad. But the test is an objective one, not a subjective one. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 728 (6th Cir. 2010) ("[A]ctual deterrence on the part of the plaintiff is not necessary to state a claim of an adverse action."). That said, we have previously observed that "we must be careful to ensure that real injury is involved, lest we 'trivialize the First Amendment.'" *Id.* (quoting *Mezibov v. Allen*, 411 F.3d 712, 721 (6th Cir. 2005)). It is with this caution in mind that we examine Nerad's conduct. Przybylski testified that she and her spouse considered selling the property because of Nerad's harassment and that Nerad's actions "mess[ed] with our quality of life at our home." (R. 29-7, Przybylski Dep., PageID 351). Although these facts do not directly speak to the question of adverse action, a reasonable juror could find that a lack of peace and privacy at home because of a government official's arbitrary surveillance constitutes a "real injury."

From that starting point, a reasonable juror could further find that the concomitant issuance of citations, imposing the threat of hundreds to thousands of dollars in fines, would deter a person of ordinary firmness from filing a lawsuit challenging the citing official's conduct. As Plaintiffs point out, to challenge a ticket the recipient must engage in time-consuming and potentially costly administrative or judicial machinery. For an ordinary person, an unexpected expenditure of hundreds to thousands of dollars can have a real impact on their ability to pay other bills or expenses. And one citation comes with "the threat of further harassment." *Garcia,* 348 F.3d at 729. Viewed in this light, Nerad's enforcement activities amounted to more than truly "inconsequential actions." *Bell*, 308 F.3d at 603. And Plaintiffs have established facts sufficient for a reasonable jury to conclude that a person of ordinary firmness would be deterred from exercising their First Amendment rights.

> ii. Causation

Like adverse action, causation is typically a factual question for the jury. *Maben*, 887 F.3d 267. To survive a motion for summary judgment, a plaintiff initially need only produce enough evidence to show that the protected activity was "a motivating factor." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010). Because a reasonable juror could conclude that Plaintiffs' *Tamm I* lawsuit was a motivating factor for Nerad's 2023 citations, and because Nerad failed to rebut this showing, Plaintiffs' First Amendment retaliation claim survives summary judgment.

As an initial matter, Tamm and Przybylski argue on appeal that the district court erred in its causation analysis. But in their response to Nerad's motion for summary judgment below, they did not brief the issue of causation. Instead, they only addressed adverse action and incorrectly concluded that Nerad did not challenge causation. By failing to respond, Plaintiffs forfeited the causation element below. *See Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 324 (6th Cir. 2023) ("When a litigant fails to address a claim in response to a motion for summary judgment, that claim is deemed abandoned or forfeited."). But because "the district court nevertheless addressed the merits of the issue" and resolved it, Plaintiffs as "the losing party can [still] challenge it." *United States v. Clariot*, 655 F.3d 550, 556 (6th Cir. 2011) (citation omitted).

Tamm and Przybylski first contend that, considering the less-than-six-month interval between the consent judgment in *Tamm I* and the issuance of the citations here, they have established causation based on temporal proximity alone. But when the time gap between the protected activity and the alleged retaliation is more than four or five months, a plaintiff cannot rely on temporal proximity alone to establish causation. *See Lemaster v. Lawrence Cnty.*, 65 F.4th 302, 310 (6th Cir. 2023). Rather, the record must also provide "other evidence of retaliatory

conduct." *Id.* (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). That is, Plaintiffs "must point to specific, nonconclusory allegations reasonably linking" their protected activity to the adverse action. *Vereecke*, 609 F.3d at 400. We look at the totality of the circumstances to determine whether a reasonable juror could infer retaliatory motive. *Id.* at 401. And here, Plaintiffs offer facts sufficient to raise a triable issue.

Along with the timing of the tickets, Plaintiffs point to Nerad's allegedly harassing conduct and derisive comment about *Tamm I* as evidence that he retaliated against them because of the earlier suit. In particular, Plaintiffs point out that around the same time Nerad ticketed them, they noticed him blocking their driveway with his vehicle and sitting at their neighbor's house and staring at them for long periods of time. Tamm says that this type of behavior has been "continuous[]" since the *Tamm I* lawsuit ended. (R. 35-5, Tamm Decl., PageID 427). Przybylski also testified that Nerad spoke disparagingly about the previous lawsuit, declaring that the *Tamm I* papers "can go in the recycle." (R. 29-7, Przybylski Dep., PageID 349). Although these facts considered individually would provide thin support, taken together with the suspicious timing of the citations and viewing them in the light most favorable to the plaintiffs, they could lead a reasonable juror to conclude that Nerad's actions were motivated at least in part by the *Tamm I* lawsuit.

Tamm and Przybylski also assert, as evidence of causation, that Nerad ticketed them, while not ticketing "dozens of other" similarly situated dock owners on Diamond Lake who "flouted the ordinance," because they alone had sued him. (ECF 13, Appellant Br., 21–24). As evidence of these similarly situated violators, Plaintiffs presented drone footage of docks in the waters of Diamond Lake during the winter/non-boating season.[4] In considering this evidence, we first ask

---

[4] *Diamond Lake Flyover – April 2, 2023* (Apr. 8, 2023). https://www.youtube.com/watch?v=mbLTtLON4qk.

what group of dock owners are similarly situated to Plaintiffs—all dock owners on Diamond Lake or only a subset who own seasonal docks or docks at West Park? Plaintiffs argue that the LREAEO "facially applies to the *entirety* of Diamond Lake (and not just the West Park property) and also facially applies to every listed lake-device regardless if seasonal or permanent." (ECF 13, Appellant Br., 23; ECF 20, Appellant Reply Br., 3).

Nerad does not dispute Plaintiffs' assertion that the LREAEO applies to all of Diamond Lake. The LREAEO broadly provides that "[n]o permanent dock, pier or similar item shall be installed, kept or maintained on, at or in Diamond Lake." (R. 35-2, Ordinances, PageID 402). In this way, the LREAEO differs from the WPO II, which regulates only West Park and North Park. Since Nerad ticketed Plaintiffs under both ordinances, it is reasonable to look beyond the West Park for comparator docks. And because Nerad's counsel conceded at oral argument that the LREAEO provides no exemption for permanent docks, we also accept both seasonal and permanent docks as relevant comparators. Thus, Nerad's retort that no other West Park docks or no other seasonal docks violated the ordinances is unavailing. Based on Plaintiffs' evidence encompassing all docks around Diamond Lake, a reasonable juror could infer from the drone footage that other similarly situated dock owners had docks in the water during the winter/non-boating season, in violation of the ordinances.

Moreover, Tamm and Przybylski offered evidence that these other dock owners did not receive tickets for keeping their docks in the lake off-season. Tamm and Przybylski "regularly attend[ed] township board meeting[s] where it is the established practice of Milan Nerad to announce every single municipal civil infraction tickets [*sic*] that he has issued in his role as zoning and ordinance enforcement official." (R. 35-5, Tamm Decl., PageID 427, ¶¶ 7–8). At these meetings, Tamm never heard of any tickets relating to docks and dock storage in the winter, apart

from the ones against them. (*Id.*). Plaintiffs do not claim that they attended every single township board meeting or that Nerad was required to announce every ticket. But Plaintiffs do point out that Nerad has not produced a single ticket showing that he "under[took] like-kind enforcement against the dozens of owners of illegally installed docks around Diamond Lake." (ECF 13, Appellant Br., 24). In doing so, Plaintiffs identify a genuine dispute of material fact.

Plaintiffs point to specific, nonconclusory allegations reasonably linking Nerad's citations to their previous lawsuit against him. *Vereecke*, 609 F.3d at 400. Viewing the facts in the light most favorable to Plaintiffs, a reasonable trier of fact could infer from the temporal proximity, Nerad's disparaging statement about *Tamm I*, his disparate treatment of Plaintiffs' dock, and his purportedly antagonizing behavior toward Plaintiffs at their home that the *Tamm I* lawsuit was *a motivating factor* for his adverse action.

Under the burden-shifting framework, the burden shifts to Nerad to show by a preponderance of the evidence that he would have issued the citations even without the *Tamm I* lawsuit against him. *Vereecke*, 609 F.3d at 400 (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–86 (1977)). In other words, Nerad must show the absence of but-for causation. *Lemaster*, 65 F.4th at 309. Nerad has not met this burden. Nerad offers little more to rebut Plaintiffs' evidence than conclusory statements that "Plaintiffs failed to present any evidence or plausible basis to demonstrate the requisite element of causation" and "[t]here is no basis to invent a claim that Defendant Nerad was motivated to punish Plaintiffs." (ECF 14, Appellee Br., 30, 53). Referring to the citations at issue in *Tamm I,* Nerad argues that he issued citations to Plaintiffs before they engaged in protected conduct and thus could not have been motivated by *Tamm I*. But Nerad's tickets under *Tamm I* are not at issue here. And Nerad does not address the

straightforward question of whether he would have issued the 2023 citations irrespective of Plaintiffs' prior lawsuit.

Beyond this failing, Nerad relies on factual disputes that are irreconcilable at the summary-judgment stage. For instance, he contends that Plaintiffs do not have a driveway that he could have blocked and he denies engaging in the behaviors that Plaintiffs describe as "creepy." But, barring blatantly contradictory evidence, courts do not resolve such factual contests. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). And, construing the facts in the light most favorable to Plaintiffs, the photo Nerad provides does not blatantly contradict Plaintiffs' statements about him blocking their driveway—perhaps Plaintiffs treat a grassy area as their driveway, for example. Indeed, these are the very issues that juries must consider and weigh. As for his attempts to undermine Plaintiffs' comparator evidence, he responds with difficult-to-decipher evidence that appears inapposite. Specifically, the two citations he provided are partially illegible, pertain to citations during the boating season (not the off-season), and appear to cite completely different ordinances, not the WPO II or the LREAEO. Thus, Nerad fails to show that he would have taken the same actions absent Plaintiffs' protected activity.

2. No-Probable Cause Requirement / Qualified Immunity

We turn then to Nerad's additional defense to Plaintiffs' First Amendment retaliation claim. Citing *Hartman v. Moore*, 547 U.S. 250 (2006), Nerad argues that Plaintiffs' failure to plead and provide evidence that he lacked probable cause to issue ticket numbers 1088 and 1091 defeats their claim. And he points out that when probable cause supports an enforcement action, qualified immunity applies.

To be sure, qualified immunity protects government officials for actions taken within the scope of their authority which do not "violate clearly established statutory or constitutional rights

of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This protection extends only to personal capacity claims. *See Benison*, 765 F.3d at 665. And officials claiming such immunity "bear the initial burden of coming forward with facts to suggest that they were acting within the scope of their discretionary authority"; they also must "connect the facts in the record to [the] two-pronged test for qualified immunity." *Cockrun v. Berrien Cnty.*, 101 F.4th 416, 419–420 (6th Cir. 2024) (alteration in original) (quoting *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992) and *Ashford v. Univ. of Mich.*, 89 F.4th 960, 975 (6th Cir. 2024)). If the official meets this burden, then the plaintiff at the summary judgment stage "must show that (1) the defendant violated a constitutional right and (2) that right was clearly established." *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 608 (6th Cir. 2015). We may consider these requirements in the order of our choosing. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). To the extent Nerad engages this framework, he only addresses prong one—arguing that Plaintiffs' failure to claim that he lacked probable cause to issue the tickets prevents them from establishing that Nerad violated their First Amendment rights.

In *Hartman*, the Supreme Court held that in First Amendment retaliatory prosecution cases, a plaintiff must plead and prove the absence of probable cause for the defendant's challenged action. 547 U.S. at 265–66. The Court later extended this requirement to retaliatory arrests in *Nieves v. Bartlett*, 587 U.S. 391, 404 (2019). And *Nieves* then provided a narrow exception to this requirement where a plaintiff can produce evidence that he or she was arrested when otherwise similarly situated individuals not engaged in the same protected conduct were not. *Id.* at 407; *see also Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024).

The parties dispute whether Nerad's conduct should be judged by the *Hartman/Nieves* no-probable-cause requirement or the *Nieves/Gonzalez* exception. But we are not convinced that

this framework applies at all. Unlike the facts in cases applying *Hartman* and *Nieves*, Nerad's enforcement action was of the civil variety. Indeed, violations of both the WPO II and the LREAEO are municipal civil infractions with no criminal consequences. Nerad cites no case extending the no-probable-cause requirement beyond retaliatory criminal prosecution and retaliatory arrest settings. And we have not "decide[d] whether *Hartman* and *Nieves* apply" outside of those contexts "to First Amendment retaliation claims based on regulatory enforcement actions." *Whiting v. Trew*, No. 22-5448, 2023 WL 5352133, at *7 (6th Cir. Aug. 21, 2023). That is "an important constitutional issue of apparent first impression in this circuit." *Id.*; *see also Rudd v. City of Norton Shores*, 977 F.3d 503, 516 (6th Cir. 2020) (declining to decide "whether a probable-cause element extends to civil suits"). Given the parties' lack of argumentation on a possible justification for such an extension of the law, we decline to decide that question now. Thus, Nerad cannot rely on any failure on Plaintiffs' part to plead and prove the absence of probable cause to obtain qualified immunity.

Nerad develops no additional qualified immunity argument, as he does not connect the facts in the record to the two-pronged test for qualified immunity. *Cockrun*, 101 F.4th at 419–420. So qualified immunity does not shield Nerad from suit. Therefore, Plaintiffs' First Amendment retaliation claim survives summary judgment.

## C. Equal Protection – Selective Enforcement

Next, Plaintiffs argue that Nerad violated their federal equal protection rights by singling them out for citations to punish them for exercising their "First Amendment right to petition the government for the redress of grievances in the form of a federal lawsuit against him in *Tamm I*." (ECF 13, Appellant Br., 27–28). They contend that Nerad selectively enforced the ordinances by

ticketing them, while declining to ticket other similarly situated individuals for the same conduct, and that Nerad's purpose was to discriminate against them.

The doctrine of selective enforcement under the Equal Protection Clause applies when the enforcement of an otherwise valid law is a means of violating constitutional rights by invidious discrimination. *See Futernick v. Sumpter Twp.*, 78 F.3d 1051, 1056 (6th Cir. 1996), *abrogated on other grounds by Vill. of Willowbrook v. Olech*, 528 U.S 562 (2000). To establish their selective enforcement claim, Plaintiffs must "show that (1) [they] belonged to a particular race, religion, or other identifiable group; (2) the official did not enforce the rule against similarly situated people outside the group; (3) the [enforcement] stemmed from a discriminatory purpose; and (4) the [enforcement] had a disparate effect." *Straser v. City of Athens*, 951 F.3d 424, 426 (6th Cir. 2020).

The district court found that Plaintiffs did not establish that the group they described constituted a protected class. As a result, the court chose to construe their claim as a class-of-one claim and concluded that Plaintiffs did not meet that test either. On appeal, Plaintiffs argue that the class-of-one analysis does not apply to their claim. They reiterate that their selective enforcement claim rests on a theory of vindictive enforcement prompted by their previous exercise of their constitutional right, rather than disparate treatment with no rational basis.

Citing *Futernick*, they argue that evidence that Nerad ticketed them after they exercised their First Amendment rights, when others who did not exercise such rights were not ticketed, will suffice for a selective enforcement claim. To be sure, "an identifiable group" can include "a group exercising constitutional rights." *United States v. Anderson*, 923 F.2d 450, 453 (6th Cir. 1991) (citing *Wayte v. United States*, 470 U.S. 598, 608 n.10 (1985)). So the district court erred in concluding that Tamm and Przbylski's claims must be relegated to class-of-one analysis. Plaintiffs effectively place themselves among a class of individuals who have previously exercised

their First Amendment rights by suing Nerad in his official capacity. And they say that Nerad targeted them for enforcement because of their membership in this class of prior litigants. In this way, they have identified a "recognizable, distinct class." *Wayte*, 470 U.S. at 608 n.10 (citation omitted).

We turn, then, to the remaining elements of the selective enforcement claim. Prongs two through four significantly overlap with the issues examined in our First Amendment Analysis. Under the second selective-enforcement prong, Plaintiffs must show that Nerad did not issue citations for improper dock storage and/or having a dock in the water off-season to similarly situated people who did not previously sue Nerad or other government officials tasked with enforcing WPO II and the LRAEAO. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005). As discussed in Section II(A), Plaintiffs have adduced sufficient evidence to establish a genuine issue of fact on this point. Likewise, the same evidence that showed that *Tamm I* may have been a motivating factor for Nerad's enforcement action, could reasonably support the third and fourth prong's requirements that Nerad's actions "stemmed from a discriminatory purpose" and "had a disparate effect." *Straser*, 951 F.3d at 426. After all, intent can be "inferred from the totality of the relevant facts" including heavier enforcement against Plaintiffs' group. *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2002). And to show discriminatory purpose, Plaintiffs need only show that Nerad acted "at least in part because of, not merely in spite of, its adverse effects" on the identified class of individuals who pursued litigation against him for enforcement of the ordinances. *Bennett*, 410 F.3d at 818 (6th Cir. 2005). Finally, the same evidence of similarly situated individuals outside of Plaintiffs' group being treated "differently" can also reasonably support a finding of disparate effect. *Id.* Consequently, Plaintiffs' Fourteenth Amendment claim also survives summary judgment.

### III.     Motion for Partial Judgment on the Pleadings

#### A.  Standard of Review

We review de novo a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) and apply the same standards that govern motions to dismiss brought under Rule 12(b)(6).  *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 480 (6th Cir. 2020); *Willman v. Att'y Gen. of the U.S.*, 972 F.3d 819, 822 (6th Cir. 2020).  That is, to avoid dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Pleaded facts will do so if they 'allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Bates*, 958 F.3d at 480 (alteration in original) (quoting *Iqbal*, 556 U.S. at 678).  "Pleaded facts will not do so if they 'are "merely consistent with" a defendant's liability.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 678).

In reviewing a Rule 12(c) motion, we can consider the pleadings, their attachments, and matters of public record without converting the motion into one for summary judgment.  *See Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).  Relevant here, Plaintiffs attached to their complaint a survey and platt of Reed's Diamond Lake Park; a computer-generated rendering of the area around the lake; a property summary of Plaintiffs' property; copies of ticket numbers 1087, 1088, and 1091 along with the dismissal order for ticket 1087; and copies of relevant township ordinances. So we may consider these items to the extent they are relevant in reviewing the district court's dismissal of their claims.

#### B.  Preemption (Count II) and Reasonableness (Count III) State-law Claims

In their complaint, Tamm and Przybylski challenged the facial validity of the LREAEO, arguing that Section 5 was both preempted by Michigan law (Count II) and unreasonable under

Michigan law (Count III). The district court held that both of these claims were precluded by *Tamm I* and the consent judgment. Tamm and Przybylski argue that these claims are not precluded because this action does not raise an issue actually litigated or which should have been litigated in the first action (*Tamm I*). We agree with the district court.

We review the district court's application of res judicata (claim preclusion) de novo. *Ohio ex rel. Boggs v. City of Cleveland*, 655 F.3d 516, 519 (6th Cir. 2011). Nerad bears the burden of establishing that claim preclusion applies. *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 572 (6th Cir. 2008). Claim preclusion protects "from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action." *Montana v. United States*, 440 U.S. 147, 153–54 (1979). It bars a claim when there is:

> (1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their privies; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action.

*Rawe v. Liberty Mut. Fire Ins.*, 462 F.3d 521, 528 (6th Cir. 2006) (quoting *Kane v. Magna Mixer Co.*, 71 F.3d 555, 560 (6th Cir.1995)).

The first two elements can be dispensed with quickly. A consent judgment qualifies as a decision on the merits. *Republic Bldg. Co., v. Charter Twp. of Clinton*, 81 F.4th 662, 667 (6th Cir. 2023) ("Res judicata applies where a consent judgment binds the parties from a previous action, or their privies, in a subsequent action."). And the parties here are the same ones that entered the consent judgment in *Tamm I*. We therefore turn to elements three and four, which center the parties' disagreement and require that we determine whether (1) the issues raised now were resolved by the consent judgment, either because they were or should have been litigated in the prior action; and whether (2) there exists an identity of the causes of action.

1. Issue Was or Should Have Been Litigated

The district court correctly concluded that the consent judgment resolved the issue of whether the LREAEO was facially valid and lawfully applied to Plaintiffs. By entering a consent decree, the "parties waive their right to litigate the issues involved in the case." *Blakely v. United States*, 276 F.3d 853, 867–68 (6th Cir. 2002) (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971)). "Consent judgments should be interpreted in a way that gives effect to what the parties have agreed to, as reflected in the judgment itself or in documents incorporated in it by reference." *Id.* at 867 (citation omitted) (alteration adopted).

Here, the consent judgment's terms specified that "each owner . . . is hereby entitled to use the 'West Park' consistent with all applicable Township ordinances." (R. 35-4, Consent J., PageID 422). Plaintiffs agreed to be "subject to the provisions of this Consent Judgment" and to "compl[y] with any applicable Lincoln Township ordinance or state or federal law except as provided herein whereby this Consent Judgment controls." (*Id.* at 419). The consent judgment also clarified that applicable ordinances included the WPO II *and* "any other applicable Township's ordinance pertaining to the West Park, and any Lincoln Township Zoning Ordinance pertaining to private boat docks." (*Id.* at PageID 423). Lincoln Township passed the LREAEO on the same day it passed the WPO II, and the consent judgment's reference to "any Lincoln Township Zoning Ordinance pertaining to private boat docks" encompassed the LREAEO, as it is a township ordinance that pertains to the use of private boat docks. (*Id.*). The consent judgment decided whether the LREAEO lawfully applied to Plaintiffs and determined that it did. Thus, Plaintiffs cannot now raise that issue again in Counts II and III.

Unconvinced, Tamm and Przybylski counter that because Nerad had not yet ticketed them under the LREAEO—only under the WPO II—their claims were not ripe during *Tamm I* and the

consent judgment negotiations. Plaintiffs' ripeness argument does not have merit. It was within Plaintiffs' power to raise whether they would be subject to the LREAEO during the consent judgment negotiations. Consent judgments should be construed "without reference to the legislation the Government originally sought to enforce but never proved applicable through litigation." *Blakely*, 276 F.3d at 868 (quoting *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236–37 (1975)). The consent judgment settled terms beyond the original ticket Nerad enforced under the WPO II. Those terms included the facial validity of the LREAEO and its applicability to Plaintiffs' dock. By accepting the consent judgment, Plaintiffs "waive[d] their right to litigate the issues involved in the case." *Id.* at 867–68 (citation omitted).

2. <u>Identity of the Causes of Action</u>

An identity of the causes of action exists "if the claims arose out of the same transaction or series of transactions, or if the claims arose out of the same core of operative facts." *Trs. of Operating Eng'rs Loc. 324 Pension Fund v. Bourdow Contracting, Inc.*, 919 F.3d 368, 383 (6th Cir. 2019) (quoting *Winget*, 537 F.3d at 580). A critical consideration is "whether the same underlying factual evidence could support and establish both [claims]." *Id.* at 384 (alteration in original) (citation omitted). That is true here. *Tamm I* relied on the following core of operative facts: (1) Tamm and Przybylski have a seasonal dock; (2) in 2020 the township regulated that seasonal dock through new ordinances, including the WPO II and the LREAEO; (3) Tamm and Przybylski challenged that regulation as facially invalid and challenged its enforcement by Nerad. Though Tamm and Przybylski tie their new claims to the issuance of new tickets, the same underlying factual evidence that supported Plaintiffs' claims in *Tamm I* also supports their new preemption and reasonableness claims, because the new claims still primarily challenge the facial validity of the LREAEO, not the issuance of the tickets. Any challenge to Nerad's enforcement

rests on Plaintiffs' argument that the underlying regulation is legally infirm because it is preempted and unreasonable under Michigan law. Thus, their challenges rely on the same core of operative facts, meaning there is an identity of the causes of action, and so res judicata bars their claims.

### C. Fifth Amendment Takings (Count V) and Inverse Condemnation (Count VI) Claims

Tamm and Przybylski assert a takings claim under the Fifth and Fourteenth Amendments, suing Nerad in his official capacity only, under § 1983. Since "official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent,'" this claim should be treated as a suit against the township. *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). Thus, Tamm and Przybylski must plausibly plead that the township's policy or custom played a part in the violation. *Id.*

Tamm and Przybylski brought their inverse-condemnation claim pursuant to Article 10, Section 2 of the Michigan Constitution and the Fifth Amendment of the U.S. Constitution (though they do not invoke § 1983 for the constitutional claim). In response, Nerad moved for partial judgment on the pleadings, arguing that both claims should be (1) barred by claim preclusion, (2) released by the binding terms of the consent judgment, or (3) dismissed for failure to state a claim. On appeal he reprises each of these grounds as reasons for us to affirm. The district court barred both claims under res judicata and found that the binding terms of the consent judgment released both claims.

As an initial matter, Plaintiffs made a basic factual mistake in their complaint. Count V asserts that Nerad committed an unconstitutional taking under the LREAEO of their "right to store their dock on the shore of Diamond Lake." (R. 1, PageID 10, ¶¶ 80–81). Count VI, in turn, asserts that "for all the same reasons outlined in Count V, Defendant . . . committed an inverse condemnation." (*Id.*). But the only enforcement action under the LREAEO (Ticket 1088) was for

"failure to remove [their] dock from lake waters," *not* for storing the dock on the shore. (R. 1-3, Citation, PageID 15). Only the WPO II ticket (Ticket 1091) faulted Plaintiffs for "boat dock on park property off season." (*Id.* at PageID 16). Plaintiffs appear to have confused the two tickets at issue. The upshot of this error is that Plaintiffs' failure to tie the complained-of action—i.e. enforcement of the LREAEO—to their purported property interest (a prescriptive easement) in storing their seasonal dock on the West Park shore forecloses these claims. This is because Plaintiffs do not allege any property interest in the lake itself, so Ticket 1088 could not have effectuated a taking under the LREAEO of Plaintiffs' dock storage rights.

Nerad did not raise this apparent error, and the district court acknowledged the discrepancy, but ultimately decided the claims under claim preclusion. We generally do not consider issues the district court did not pass on below. *See Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988). But this rule is not jurisdictional, and we may deviate from it in "exceptional cases," such as when "the issue is presented with sufficient clarity and completeness and its resolution will materially advance the progress of [an] already protracted litigation," in which case, "we should address it." *Id.* (citation omitted). Even when neither party raises an issue, we may address it, if it is "'antecedent to . . . and ultimately dispositive of' the dispute before it." *U.S. Nat'l Bank v. Indep. Ins. Agents of Am.*, 508 U.S. 439, 447 (1993) (citation omitted); s*ee also Quality Assocs., Inc. v. Proctor & Gamble Distrib. LLC*, 949 F.3d 283, 287 n.2 (6th Cir. 2020). That is the situation here. Plaintiffs' fundamental factual error means that their takings and inverse condemnation claims fail out the gate. With no allegations in Counts V and VI setting forth an encroachment on Plaintiffs' purported property rights, there is no reasonable inference to be drawn that Nerad's actions establish a plausible claim for relief. *Iqbal*, 556 U.S. at 678.

Alternatively, even if we declined to address this fundamental failing of Plaintiffs' takings and inverse condemnation claims, both claims would still fail because they are also precluded by *Tamm I*. As the district court aptly observed, Plaintiffs' takings and inverse condemnation claims are, at their core, challenges to the ordinances' regulation of their boat dock—in this instance Plaintiffs' right to store their dock at West Park. On its face, the WPO II prohibits installing, storing, keeping or utilizing a dock on or at West Park or its shoreline and bottomlands. It contains a carveout allowing the owners of Lots 84 and 85 merely to "install" a "seasonal dock" "at the shoreland and bottomlands of West Park," not to store one there year-round. (R. 1-7, Ordinances, PageID 25, 30). And the LREAEO requires removal of all seasonal docks from Diamond Lake during the off season. (R. 1-6, Ordinances, PageID 21). This was true at the time of *Tamm I* just as it is true during *Tamm II*. So Plaintiffs had sufficient information to discern whether the ordinances' prohibitions impinged their property rights, and their ripeness arguments fail as to these claims for the same reasons they fail as to Counts II and III.

In short, we agree with the district court that any challenge Plaintiffs wish to bring as to their storage rights under either the WPO II or the LREAEO is an issue that should have been litigated as part of *Tamm I*. *Rawe*, 462 F.3d at 528. Because their challenge is fundamentally a challenge to the ordinances' regulation of their dock storage at West Park, it relies on the same core of operative facts, and there is an identity of the causes of action. *Bourdow Contracting*, 919 F.3d at 383. Having met all the elements of res judicata, Plaintiffs' takings and inverse condemnation claims are precluded.

## IV.    CONCLUSION

We AFFIRM the district court's grant of partial judgment on the pleadings as to preemption, reasonableness, takings, and inverse condemnation (Counts II, III, V, and VI),

REVERSE the district court's grant of summary judgment as to First Amendment retaliation (Count I) and Fourteenth Amendment selective enforcement (Count IV), and REMAND to the district court for further proceedings consistent with this opinion.